**WALT DISNEY PRODUCTIONS,**
Plaintiff-Appellant,

v.

**FRED A. NILES COMMUNICATIONS CENTER, INC., et al., Defendants-Appellees.**

No. 15703.

United States Court of Appeals
Seventh Circuit.

Nov. 9, 1966.

Francis A. Utecht, Long Beach, Cal., Francis A. Even, James J. Schumann, Chicago, Ill., Fulwider, Patton, Rieber, Lee & Utecht, Long Beach, Cal., Anderson, Luedeka, Fitch, Even & Tabin, Chicago, Ill., for appellant.

Owen J. Ooms, Erwin F. Adams, Chicago, Ill., Lawrence W. Skebelsky, Chicago, Ill., of counsel, for appellees.

Before DUFFY, Senior Circuit Judge, and CASTLE and FAIRCHILD, Circuit Judges.

DUFFY, Senior Circuit Judge.

This suit is for the alleged infringement of United States Patent No. 3,118,-340 entitled "Panoramic Motion Picture Camera Arrangement." The patent was issued on January 21, 1964 to Ub Iwerks who has assigned his interest to plaintiff. Claim 8 of the patent is at issue.

In the District Court, defendants argued 1) the patent in suit is invalid because it fails the test of nonobviousness under 35 U.S.C. § 103; 2) that its specification and claims are insufficient under 35 U.S.C. § 112; and 3) that there was no infringement even if the patent were held valid.

As to defendant's claim under 35 U.S.C. § 112, the District Court held the specification and claim adequately set forth a description of the invention so that one skilled in the art could practice the invention. The Court overruled defendant's contention that the term "camera lenses" instead of the more precise technical term "lens nodal points" made the patent fatally defective under 35 U.S.C. § 112. The Court also overruled defendant's claim that the use of the term "substantially" made the patent invalid under the same section.

As to infringement, the District Court pointed out that the only basic structural difference relied on to avoid infringement is a variation of the spacing relationship between each camera and its associated mirrors; the defendants moved the lens nodal point approximately one-half inch closer to the mirror. The Court found that the accused rig achieves plaintiff's goal of avoiding gaps and double images. The Court held defendants' rig infringed if Claim 8 of the patent in suit is valid.

However, the Court sustained defendants' claim that any difference between the patent in suit and the prior art was obvious and therefore the patent is invalid under 35 U.S.C. § 103. The Court ordered judgment in favor of defendants.[1]

In explaining his view that Claim 8 of the patent was obvious the trial judge said:

"* * * The simple physics of the problem requires placement of the cameras below the mirrors, rather than next to them, in a 360-degree rig. The prior art would lead a person skilled in the art to the same conclusion. Finally, the prior art teaches a person skilled in the art how to arrange a camera and a mirror in vertical re-

---

1. The District Court's Memorandum Opinion is reported at 253 F.Supp. 1.

lationship for 360-degree panoramic photography. The prior art does not show a device identical to plaintiff's; but, it provides a wealth of learning from which a person skilled in the art could easily construct plaintiff's rig. *In short, plaintiff's combination of known elements produces no unusual or surprising result and is therefore not entitled to a patent."* [Emphasis supplied.]

The invention is directed to a 360-degree motion picture camera arrangement utilizing multiple cameras. As early as 1900, at the Paris Exposition, a plurality of motion picture cameras had been used for 360-degree panoramic photographs. This was the "back-to-back" arrangement which has been used commercially by plaintiff in Disneyland.

From the beginning, the problems of parallax were evident in systems that used a plurality of cameras to photograph a panoramic field. The back-to-back systems used were unsatisfactory because of gaps between the individual camera fields and because of double-image overlap.

Fig. 4 of the patent in suit is the top plan view of the back-to-back camera arrangement of the prior art and is here reproduced.

IWERKS PATENT NO. 3,118,340

FIG. 4

It will be noted that the cameras are equi-distantly separated from one another about a circle with their specific axes extending radially outward. The camera field of each camera appears in white. There is a gap between each camera area which is represented by the shaded portion. This area is not covered by either camera so that subjects therein will not be photographed. Also, further out from the cameras, the adjacent field limits converge and thereafter the fields overlap and a double image results.

An accurate description of the result of using the earlier back-to-back camera arrangement is "The individual scenes projected on the individual screens are photographed by individual cameras ar-

ranged in an assembly, equi-distantly spaced from each other, with their optical axes extending radially outward. Because of the spacing between the adjacent camera lenses the fields photographed thereby do not match one another, there being gaps between the photographic fields adjacent to the cameras and an overlapping of the fields in the areas remote from the cameras."

The practical effect of the gaps was a loss of subject matter between cameras. One result has been termed "the disappearing actor" phenomenon. If an actor close to the camera passed from the field of one camera to the field of the adjacent camera, the actor would, in whole or in part, disappear as he moved through the gap between the cameras. This phenomenon effectively prevented the use of the prior art 360-degree camera arrangement in taking closeup shots.

As to the gaps between the fields, the left-hand portion of an object would appear in the left-hand field, and the right-hand portion of the object would appear in the right-hand field, but the center portion of the object would not appear in either field because such center portion was in the gap between the two cameras. The elimination of the gaps provides a smooth continuity between adjoining camera fields with respect to objects that appear concurrently in both adjoining fields.

The inventor Iwerks has had over forty-five years of continual experience in the motion picture business. He became head of the Special Effects Department at the Walt Disney Studios. Since 1957, he has been assigned to perform solely technical research work. He received Motion Picture Arts & Sciences Awards in 1958, 1964 and 1965. Clearly, he was highly skilled in the motion picture art.

The development of the patented camera arrangement was obtained "after considerable trial." The cost of developing the patented camera arrangement was approximately $34,000 not including the salary of Mr. Iwerks.

The patented camera arrangement was licensed to the Fiat Corporation of Italy, the Swiss Federal Railways and the Telephone Corporation of Canada. Also, the original 360-degree motion picture theatre at Disneyland is being demolished to be replaced by a theatre about twice the size of the original theatre in order to present the type of film made possible with the patented 360-degree camera arrangement.

Iwerks first constructed a 360-degree motion picture camera arrangement for plaintiff in 1956. He utilized the old back-to-back concept dating back to 1900. The arrangement is shown in Fig. 4 hereinbefore reproduced.

In March 1960, Iwerks commenced work on the patented camera arrangement sometimes referred to as the "nine camera rig."

To solve the problem of gaps between the photographic field adjacent to the cameras and the double image producing overlapping of objects remote from the cameras, Iwerks mounted a plurality of cameras about a horizontal circle, each camera positioned to point upwardly toward a reflecting surface arranged at a 45-degree angle to the horizontal and the vertical. The distance along the vertical optical axes from each camera lens to its associated reflecting surface was substantially equal to the horizontal radial distance from the optical axes to the center of the camera circle. Thereby each camera photographed substantially a true sector field with the sides thereof in substantial coincidence.

The undesirable gaps and the likewise undesirable double image overlapping were avoided by Iwerks' arrangement because the camera lenses were all placed in optical coincidence at the center of the circle field being photographed. This new arrangement opened up a whole new area of story action. By eliminating double image overlaps, it became possible for the first time to produce clear, unblurred images of objects remote from the center of the picture. It was now possible to use long shots in connection with closeup shots.

Defendants' camera arrangement which plaintiff claims was and is an infringement, was designed by Behrend and defendants' trial witness, Schinke. Behrend admitted on the stand that the only literature he had read before commencing the designing of defendants' camera rig was an article in a 1962 magazine which described plaintiff's patented camera arrangement. He admitted he used the same kind of Kinetal lens as in the plaintiff's camera arrangement, although many other lenses were available. Defendants' rig also employed Arriflex 16 M cameras, the same type as employed by plaintiff.

■ We hold that the District Court's finding that the patent in suit complies with 35 U.S.C. § 112 is correct. Certainly, it is not clearly erroneous and therefore should not be upset.

■ We also hold that the District Court's finding of infringement if the patent is valid, is also correct. The evidence of copying is clear.

Thus, on this appeal, the only issue we need discuss in any detail is the validity or invalidity of the patent in suit as determined by the obviousness or nonobviousness of the patented subject matter to one skilled in the motion picture art as of August 26, 1960, the filing date of the patent. No issue is raised as to novelty and utility as articulated and defined in 35 U.S.C. §§ 101 and 102.

■ We start with the presumption of validity. 35 U.S.Code § 282 provides: "A patent shall be presumed valid. * * The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting it." We have held that such party has a heavy burden of establishing invalidity by clear and convincing evidence. King-Seeley Thermos Co. v. Tastee Freez Industries, Inc. 7 Cir., (1966), 357 F.2d 875, 879, cert. den. 87 S.Ct. 38; Devex Corp. v. The General Motors Corp., 7 Cir. (1963), 321 F.2d 234, 238, cert. den. 375 U.S. 971, 84 S.Ct. 490, 11 L.Ed.2d 418 (1964); Copease Manufacturing Co. v. American Photocopy Equipment Co., 7 Cir. (1961), 298 F.2d 772, 777.

■ The remaining test of invention is nonobviousness as defined in 35 U.S. C. § 103. The difference between the subject matter sought to be patented and the prior art must be such that the subject matter as a whole would have been obvious to a person having ordinary skill in the art to which said subject matter pertains, as of the date of the invention.

■ We note that the District Court, in holding claim 8 to be obvious, emphasized "In short, plaintiff's combination of known elements produces no unusual or surprising result and is therefore not entitled to a patent." We think this was an incorrect test for the "unusual and surprising result" as a controlling factor has gone with the "flash of creative genius."

In Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Supreme Court emphasized the requirements of 35 U.S.C. § 103 must be strictly observed. One such requirement is that the question of obviousness be decided as of the time the invention was made. Here, both defendants' expert and the District Court apparently based their opinions as of the time of trial. Thus hindsight was, in fact, used by both the expert and the trial court.

The Court, in Abington Textile Machinery Works v. Carding Specialists [Canada] Ltd., D.D.C.1965, 249 F.Supp. 823, 834 said: "Nothing in this world is more obvious than that which is obvious by hindsight *after* the fact of making an invention." We agree with this observation.

In Holley v. Outboard Marine Corp., N.D.Ill. (1964), 241 F.Supp. 657, 665, aff'd. 7 Cir. (1965), 345 F.2d 351, cert. den. 383 U.S. 934, 86 S.Ct. 1062, 15 L.Ed. 2d 851, reh. den. 384 U.S. 914, 86 S.Ct. 1334, 16 L.Ed.2d 366 (1966), the Court said: "Once a system such as plaintiff's is marketed, it, of course, becomes possible to speculate as to its similarity to a particular combination of elements from

prior patents. Hindsight, however, is not the test of obviousness or anticipation."

In his memorandum opinion, the District Judge attempted to place himself in the role of one skilled in the art. He started with the back-to-back camera first used in 1900 at the Paris Exposition, and later used by Iwerks in 1956 when he designed the first 360-degree camera arrangement for plaintiff. He then described six rather complicated steps referring to various patents.

The steps described for the skilled artisan are logical enough when taken in reverse order, but it is apparent that the skilled artisan's choice of a camera and mirror arrangement of the cinerama type was not obvious in 1960. There was nothing in the prior art that would suggest that the arrangement could be used to produce a 360-degree motion picture that would not have the drawbacks of those first produced.

The gaps and double image problems were easy to solve when only three cameras and two mirrors were involved. In fact, this was solved way back in 1908, the date of the French Patent 385,423. However, no one solved the problems in the 360-degree field until the inventor of the patent in suit did so in 1960.

Reliance on French Patent No. 704,471 is misplaced. The only logical suggestion that might come from that patent to the skilled artisan is that he should abandon the concept of a multiple camera and substitute a single camera system.

As heretofore stated, inventor Iwerks first developed a 360-degree motion picture arrangement in 1956. Iwerks was highly skilled in the art, but his first 360-degree arrangement utilized the old unsatisfactory concept. There was nothing obvious to him at that time which would solve the problems which had been encountered. When Iwerks failed in his first attempt he then engaged in a long and costly development program.

The District Court seemed to find significance in the fact that until 1960, there was very little activity in the 360-degree motion picture field. However, within five years after 1960, when the patented system had been developed, plaintiff licensed the arrangement to the Swiss Federal Railways, the Telephone Corporation of Canada and to Fiat, manufacturers of automobiles. Furthermore, plaintiff began steps to produce a film with the patented arrangement for use at Disneyland, and also defendants produced their apparatus. These activities indicate that after Iwerks had developed his system, the previous lethargy came to an end.

■ We hold the evidence relied on by the District Court to find obviousness was not sufficient to overcome the presumption of validity which attached to the patent in suit. To us, it seems such evidence strongly points to nonobviousness.

■ That part of the judgment of the District Court which held the patent in suit to be invalid is reversed. Plaintiff may have judgment that claim 8 of the patent in suit was infringed by defendants.

Affirmed in part, reversed in part.

CASTLE, Circuit Judge (dissenting).

I find myself unable to agree with the conclusion of the majority that the District Court applied an incorrect test for nonobviousness because "the 'unusual and surprising result' as a controlling factor has gone with the 'flash of creative genius'." I cannot reconcile such a conclusion with the recent pronouncement in United States v. Adams, 383 U.S. 39, 51, 86 S.Ct. 708, 714, 15 L.Ed.2d 572, that:

"We conclude the Adams battery was also nonobvious. As we have seen, the operating characteristics of the Adams battery have been shown to have been unexpected and to have far surpassed then-existing wet batteries."

*Adams* recognizes "unexpectedness", which can be equated with "unusual or surprising" as an appropriate factor in the determination of nonobviousness. The converse appears to be implicit, and I am unaware of anything which impairs the continuing validity of Great Atlantic

& Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162, insofar as it approved recourse to the "unusual or surprising consequences" factor by stating:

"This case is wanting in any unusual or surprising consequences from the unification of the elements here concerned, and there is nothing to indicate that the lower courts scrutinized the claims in the light of this rather severe test."