**OGLEBAY NORTON COMPANY, a Delaware corporation, Plaintiff,**

v.

**UNIVERSAL REFRACTORIES CORPORATION, a Wisconsin corporation, Defendant.**

No. 65–C–310.

United States District Court
E. D. Wisconsin.

June 11, 1969.

Paul R. Puerner, Milwaukee, Wis., M. Hudson Rathburn, Robert L. Rohrback, and Walther E. Wyss, Chicago, Ill., J. Herman Yount, Jr., Cleveland, Ohio, for plaintiff.

Edward D. Cleveland, Ronald E. Barry, and Fred Wiviott, Milwaukee, Wis., for defendant.

## OPINION AND ORDER

REYNOLDS, District Judge.

This action for patent infringement arises under the patent laws of the United States, Title 35 U.S.C. §§ 271, 281 et seq. The jurisdiction of this court is based on Title 28 U.S.C. § 1338, and

venue lies in this district by virtue of Title 28 U.S.C. § 1400(b).

This matter was tried to the court on February 5, 1968. In addition thereto, the court and counsel visited a steel mill in Gary, Indiana, for the purpose of familiarizing the court with the pouring of steel molds and the use of the hot top in conjunction with the commercial product of the Carpenter patent. Subsequent to trial, counsel have prepared and submitted post-trial briefs along with proposed findings of fact and conclusions of law.

## THE PARTIES

Plaintiff, Oglebay Norton Company (hereinafter referred to as "Oglebay"), is a Delaware corporation with its principal place of business in the Hanna Building, Cleveland, Ohio. Defendant, Universal Refractories Corporation (hereinafter referred to as "Universal") is a Wisconsin corporation having its principal place of business at 9800 West Rogers Street, Milwaukee, Wisconsin.

## THE PATENT IN ISSUE

Oglebay is the owner of United States Letters Patent No. 3,216,689 (hereinafter referred to as "Carpenter patent") issued to Oglebay on November 9, 1965, as assignee of Joel C. Carpenter on an application, Serial No. 233,949, filed on September 17, 1962. The claimed invention relates generally to hot tops, but more particularly to a multiple panel wrap-up unit for insertion in a reusable ingot mold hot top.

Hot tops are used by the steel industry in the casting of metal ingots. Their function is to reduce or eliminate from the main body of a steel ingot the piping or shrinkage cavities that would otherwise be formed in the main body of the ingot as the steel passes from the molten to the solid state.

Hot tops accomplish this desired result by providing a reservoir (herein-

after referred to as a "sinkhead") at the upper end of the ingot mold, which sinkhead is insulated so that the molten steel in the sinkhead is kept molten while the steel in the mold solidified. Thus, during cooling and solidification of the steel in the mold, the hotter and more fluid steel in the sinkhead keeps feeding down into the main ingot body with the result that the cavities are confined to the sinkhead which can be discarded after solidification with a minimum loss of steel.

There are various types of hot tops employed by steelmakers, including a class known as "Adjustable Floating Hot Tops" which are made slightly smaller in cross section than the mold and are set into the upper end of the mold and supported on temporary blocks that are removed immediately after the molten steel is poured so that the hot top floats with the molten steel during solidification. These adjustable floating hot tops include "Reusable" hot tops that can be used over and over for a substantial number of heats but which require reconditioning and/or rebuilding to some extent for each successive pouring.

The Carpenter patent claims a multiple panel wrap-up unit for insertion inside such a reusable hot top structure.[1] In general terms, this wrap-up insert unit consists of a plurality of panel members which have a predetermined configuration and which are hingedly interconnected by a flexible means, such as corrugated cardboard. This insert unit may be and is packaged and shipped in a flat position and then folded into a preselected, open-ended, hollow configuration for insertion into a reusable hot top so as to provide an insulating lining therefor. The panels of the insert unit are made of a material which weakens when subjected to the high temperature of molten steel so as to facilitate removal of the hot top from the solidified sinkhead. The hot top is then rendered reusable by cleaning

[1]. The Carpenter disclosures (column 2, lines 30–36) and the testimony of Mr. Fishleigh, plaintiff's expert witness, both indicate that the claimed invention could also function as a one-use hot top if the panels were to be made thicker.

it out and inserting a new multiple panel insert unit.

More specifically, the hot top includes a permanent outer casing formed of cast iron having a central opening, preferably tapered, and provided with a refractory lining of relatively soft insulating brick (hereinafter referred to as "brick lining") that is in itself incapable of withstanding the heat of molten steel. In order to protect this brick lining against heat and mechanical damage, the hot top is provided with a panel insert unit which includes a plurality of heat collapsible panels formed of a granular refractory material (sandlike in appearance) bonded by a heat destructible binder. A flexible backing member (preferably corrugated cardboard) is connected to the back sides of these panels. The panels are preformed to a particular shape and size, and when secured to this flexible backing member, they are disposed in a side-by-side, spaced relation so that the entire unit may be shipped to the steel mill in a flat condition and readily wrapped up at the steel mill for insertion into the reusable hot top casing. When the unit is wrapped up, the panels move from their side-by-side relation to edge-abutting positions with the edge surfaces of adjacent panels in area engagement. When inserted into the hot top casing, the cardboard backing is disposed between the back surfaces of the insulating (sandlike) panels and the insulating brick lining. When thus inserted into the hot top casing, a bottom refractory

ring having a portion engageable with a portion of the bottom side of the insert unit is secured to the hot top casing to support the insert unit therein. When employed with a hot top having a tapered central opening, the corrugated cardboard backing member and the panels are suitably shaped, the panels having converging sides, so that when wrapped up, the panels of the insert unit define a tapered opening through the hot top.

Recited objects of the claimed invention are an improved method for emplacement of preformed hot top panel linings; improved methods for the packing, shipping, and assembly of such preformed panel linings; an improved means of venting the gases generated during the pouring of metal ingots; improved provisions for the stripping of the hot top from the ingot mold; and an improved veneer facing for the insulating lining of a hot top structure.

I find that all of these objectives of the claimed invention were in fact proved at trial with the exception of an improved means of "venting the gases generated during the pouring of the metal ingots." There was much testimony about the effect of the burning of the corrugated cardboard, but I am satisfied that all of the claimed virtues of this effect were minor or incidental, were not contemplated by the inventor, and are of no real significance to the functioning of the Carpenter patent.

Claim 1 of the patent [2] recites the combination of a hot top casing having a

2. The claims of the patent read as follows:
    "1. A hot top structure comprising a hot top casing having a central opening therethrough, a refractory lining in said casing, a panel insert unit for providing a protective heat and mechanical damage barrier between a mass of metal in the hot top and the refractory lining in the hot top casing, said panel insert unit including a plurality of heat-collapsible refractory insert panels having front sides defining adjacent wall portions of the opening through said casing and back sides disposed so as to face said refractory lining, said insert panels being of a refractory material bonded by a heat-destructible binder and retarding heat trans-

mission to the insulating refractory lining of the casing, flexible material hingedly interconnecting said insert panels for relative movement from relative positions wherein the panels are disposed in side-by-side relationship with adjacent edge surfaces of the panels facing each other to angularly related positions wherein the panels are disposed with the adjacent edge surfaces thereof in area contact and forming the insert unit.
    "2. A hot top structure including a panel insert unit for forming a facing layer for the refractory lining of a hot top casing having a vertically tapered central opening therethrough to provide a protective heat and mechanical damage

central opening and a brick lining with a panel insert unit which includes a plural-' ity of heat-collapsible refractory insert panels and flexible material hingedly interconnecting the panels for relative movement. The panels are composed of a refractory material bonded by a heat-destructible binder to retard heat transmission. The flexible interconnecting material allows the panels to be relatively moved from a side-by-side position where the adjacent edge surfaces face each other to an angularly related position wherein the adjacent edge surfaces are in area contact and define the opening in the casing.

Claim 2 is substantially the same as claim 1 except for the recitation that the casing has a tapered opening and the insert panels are also tapered.

Claim 4 is substantially the same as claim 2 except that the flexible material

barrier between a mass of metal in the hot top and the interior lining of the hot top casing, said panel insert unit comprising a plurality of heat-collapsible refractory tapered insert panels having front sides for defining adjacent wall portions of the opening through said casing and back sides to be disposed so as to face said refractory lining, said insert panels being of a refractory material bonded by a heat-destructible binder and retarding heat transmission to the insulating refractory lining of the casing, flexible material hingedly interconnecting said tapered insert panels for relative movement from relative positions wherein the tapered panels are disposed in side-by-side relationship with adjacent edge surfaces of the tapered panels facing each other to angularly related positions wherein the panels are disposed with the adjacent edge surfaces thereof in area contact and forming a tapered insert unit.

"3. A hot top structure as defined in claim 2 further including means for supporting said tapered panel insert unit in the hot top casing including a bottom refractory ring having a portion engageable with a portion of the underside of said insert unit.

"4. A panel insert unit for emplacement in a hollow hot top structure to be supported at the upper end of an ingot mold and for location in a tapered hot top structure so as to define a tapered opening through the hot top structure and provide a protective heat barrier therefor, said panel insert unit comprising a plurality of insert panels having front sides for defining portions of the tapered opening through the hot top structure and back sides, a flexible corrugated cardboard connected to the back sides of said insert panels so as to be disposed between the panels and said hot top structure when said unit is emplaced therein, said insert panels having converging sides with the adjacent sides of adjacent insert panels being positioned in a parallel rela- tion to each other when connected, said cardboard interconnecting said insert panels for relative angular movement from relative positions wherein the panels are disposed in a side-by-side relationship to edge abutting positions with adjacent edge surfaces of the panels in engagement over a substantial area substantially throughout the length of the edges, said insert panels being comprised of a refractory insulating material and a heat-destructible binder and said cardboard being adapted to provide a venting space between said insert panels defining said tapered opening and said hot top structure.

"5. In a hot top including a hollow hot top structure to be supported at the upper end of an ingot mold, the improvement comprising a multiple panel insert unit providing a protective heat barrier for the hot top structure and comprising a plurality of insert panels having front sides defining portions of a central opening through the hot top structure and back sides facing the hot structure, a flexible corrugated cardboard connected to the back sides of the insert panels and disposed between the insert panels and the hot top structure and interconnecting said insert panels for relative angular movement from relative positions wherein said panels are disposed in a side-by-side relationship with adjacent edge surfaces of the panels facing each other to edge abutting positions with adjacent edge surfaces of the panels in engagement over a substantial area substantially throughout the length of the edges, said panels being comprised of a refractory insulating material and a heat-destructible binder and said cardboard functioning to provide a venting space between said insert panels and the hot top structure.

"6. In a hot top as defined in claim 5, a bottom refractory ring having a portion engageable with a portion of the underside of the insert unit for supporting the insert unit in the hot top structure."

**1110**

is recited as being corrugated cardboard, and the panels are recited as having converging sides rather than being tapered. Claim 5 is similar to claim 4 except that the panels in the former are not recited as having converging sides.

Claims 3 and 6 are identical to claims 2 and 5, respectively, except for the recitation of the refractory bottom ring for supporting a panel unit.

Universal's Exhibit No. 34, reproduced here illustrates the features[3] of the

DEFENDANT'S EXHIBIT 34

HOT TOP OF J. C. CARPENTER, U.S. 3,216,689

CASING
WOOD BLOCK
INGOT MOLD
BOTTOM RING
FIREBRICK
REFRACTORY LAYER
EXOTHERMIC FACING
CARDBOARD
WIPER STRIP
SEALING COMPOUND

3. Variations of the claimed invention provide that the insert unit (composed of 47 and 48) may be positioned inside of flange (12) or have one edge under the flange (12) in engagement with the surface thereof or the underside of flange

claimed invention. This figure is a view partly in elevation and partly in section of a hot top constructed in accordance with the claimed invention and shown mounted in the open upper end of an ingot mold (29). It discloses the upper (10) and lower (11) sections of the metal casing of the hot top; an integral inwardly extending canopy or flange (12) at the upper end of the metal casing (10); an integral inwardly extending lip or flange (13) at the lower end of the metal casing (11); the insulating fire brick lining (21); sealing compound (28); flexible material (preferably corrugated cardboard) forming a backing sheet for the preformed panels (42); and the preformed panels consisting of an essentially self-sustaining refractory supporting layer (47) having integrated therewith on one side an exothermic facing layer (48).

The patent statutes, Title 35 U.S.C., prescribe three requirements of patentability; namely, novelty, utility, and nonobviousness as set forth and defined in §§ 102 and 103. The sole question for the court's determination in this particular action, however, is whether claims 1 through 6 of the patent in issue are valid over the prior art.[4] More particularly, invalidity of the Carpenter claims is asserted on the ground that they do not meet the statutory requirement of nonobviousness set forth in § 103 [5] which provides that a patent may not be obtained if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious to a man having ordinary skill in the art at the time the invention was made. Universal has admitted that if these claims are found by the court to be valid, they have been infringed by the defendant.[6]

The defense of obviousness having been raised, it becomes necessary for this court (1) to determine the scope and content of the prior art; (2) to ascertain the differences, if any, between the prior art and the claims at issue; and (3) to determine the level of ordinary skill in the pertinent art at the time of the claimed invention. Graham v. John Deere Co., 383 U.S. 1, 14, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

### SCOPE AND CONTENT OF THE PRIOR ART

Defendant has cited twenty-three prior art patents which it feels indicate that the claimed invention was obvious in light of the scope of the prior art. The following patents are those that I deem most pertinent.

*Mueller patent No. 3,039,158* discloses a reusable hot top structure having an outer metal casing with a brick lining and a vertically tapered opening for being positioned at the upper end of an ingot mold and a plurality of individual and separate tapered panels for insert therein which have converging sides. The individual panels are so shaped that when they are in position within the outer metal casing, their edge surfaces are disposed in a parallel relation with adjacent edge surfaces in engagement over a substantial area. These panels are composed of a refractory supporting layer and an exothermic facing layer. In addition, the exothermic layer is described as containing a heat-destructible binder. The exothermic layer forms the front surface and defines the tapered hot

---

(12) may be grooved to receive the top of the insert unit.

4. Final Pretrial Stipulation No. 34.

5. Title 35 U.S.C.
    "§ 103. Conditions for patentability; non-obvious subject matter
    "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. July 19, 1952, c. 950, § 1, 66 Stat. 798."

6. Final Pretrial Stipulation No. 24.

top opening; the refractory layer constitutes the back surface which faces the brick lining of the metal casing. A notched bottom ring is provided for supporting the individual panel inserts.

*The British patent No. 776,290* discloses a reusable tapered hot top structure constructed to be supported at the upper end of an ingot mold and having a brick lining and a plurality of individual and separate refractory insert panels which have adjacent edge surfaces disposed in an abutting relation when the panels are within the hot top casing so as to provide a heat and mechanical damage barrier for the brick lining. The suggested panel composition does not include heat destructible materials, but the patent does make mention of the possible inclusion of carbonaceous material which, if added in sufficient amounts, would render the panels friable or heat collapsible.

*The Eayrs patent No. 2,361,386* discloses a single-use hot top structure arranged to be positioned inside the upper end of an ingot mold. This structure is not designed for use in a reusable hot top. It consists of a plurality of panels (part exothermic and part refractory) which are hinged together by a flexible material, such as wire. This flexible means of connecting the panels permits the assembly to be stored and shipped in a flat position and then folded into an angularly related position wherein the edge surfaces are in area contact, at which time the assembly is ready for use. The initial panel ingredients include a percentage of burn-out material, but this material is burned out in the baking or maturing of the panels, a process which occurs in preparing the assembly for subsequent use as a hot top.

*The Swedish patent (Wahlstrom) No. 142,479* is another patent which deals with hot tops as such and not insert units for reusable hot tops. It discloses both single-use and reusable hot top structures adapted to rest in the notched upper end of an ingot mold. These assemblies consist of a plurality of individual insert panels composed of a variety of materials.

One variation suggests that the panels consist of perforated sheet metal. The side of the panel facing the ingot is coated with a refractory material having a heat-destructible binder. The side of the panel facing the mold wall is painted with a reflective substance, i. e., aluminum paint. When inserted, the panels are bent towards the mold wall at their end sections, thus forming a closed air space between the mold and the panel which increases the insulating ability of the structure. After use the metal panels are cleaned and then recoated for further use.

Another variation discloses a panel backing consisting of corrugated cardboard, the inward side of which is coated with a refractory material having a heat-destructible binder so as to fill the areas between the corrugations. The crests of the corrugations on the other side contact the wall of the ingot mold so as to provide a relatively closed insulating air space. A panel of such composition is in most cases completely lost after a single use.

*The French patent (Vayda) No. 1,215,009* discloses both a reusable hot top assembly to be positioned at the upper end of an ingot mold and a prefabricated ingot mold lining. Figures 1 and 2 disclose a prefabricated lining to be positioned in the upper end of an ingot mold and consisting of one or more layers of corrugated cardboard, or a similar cellulose base material, impregnated with refractory material—with or without an additional layer of exothermic material facing the wall of the ingot mold. When the impregnated cardboard comes into contact with the molten metal it is carbonized, leaving a layer of carbon adhering to the wall of the ingot mold. This carbon layer, in turn, constitutes a barrier which reduces the loss of heat through the wall of the mold. The optional exothermic layer, through the production of additional heat, further reduces the overall heat loss from the top

of the ingot mold. While the disclosures suggest gluing the lining to the walls of the ingot mold, there is an indefinite reference to "another element" which could be folded together during manufacture and later unfolded and suspended from the upper rim of the mold by means of metal straps.

Figures 3 through 7 disclose corrugated cardboard (either unimpregnated or impregnated with refractory material) formed into one or more envelopes containing exothermic material combined with a binder. The carbonizing of the cellulose base envelope will again produce a carbonized layer which provides a uniform development of the heat being produced by the enclosed exothermic material. The heat is also developed over a longer period of time. This variation may also be glued to the walls of the ingot mold or suspended from the upper rim of the mold by means of metal straps. The envelope or envelopes may be used to line either a hot top assembly or the upper end of the ingot mold itself.

Figures 8 and 9 disclose a prefabricated ingot mold lining consisting of one or more bands of corrugated cardboard, or similar cellulose base material, impregnated with refractory material and covered with exothermic plates placed side-by-side on the surface of the cardboard facing the mold wall. This "flexible belt of elements placed side by side" may be either glued to the walls of the ingot mold or suspended from the upper rim of the mold by means of metal straps.

*The British patent No. 832,555* discloses an insert unit for use in unlined hot tops, or risers of ingot molds, including a plurality of long narrow strips of either refractory or exothermic material, or a composite of the two, mounted on a flexible means—wires or a strip of flexible fabric, asbestos, or the like—which may be mounted in a flat position for shipment or storage and arranged in a circular fashion for insertion into a hot top. The insert may be bent into an arc with the strips facing either toward or away from the wall of the hot top, depending on whether the strips are spaced apart or mounted contiguously on the flexible material. In another variation, the strips may be mounted on the flexible support so that they are capable of movement along the length of the support. This has the advantage that any degree of curvature likely to be required in practice can be accommodated by the one flexible material, the length of the curve being set by the length of the flexible support used and the strips being moved along the wire into contiguous relationship so that an unbroken curve of the material is obtained.

*The De Maison patent No. 3,106,756* discloses, for use either as a single use hot top or as a single use liner for the metal casing of a hot top, preformed refractory mineral wool bats with or without wire mesh backings. These bats may be long enough to be bent into the proper shape and bound with wire or steel bands to form a single-use hot top or a liner for a reusable hot top, or they may be in the form of a plurality of smaller panels so that a plurality of panels may be assembled to form the hot top or may be assembled into a metal shell or casing. The De Maison claims also show a reusable hot top structure in which the metal casing of the hot top is formed of a plurality of plates of expanded metal mesh, or plates of sheet metal, hinged together and having a single mineral wool bat fastened to the inner surfaces of the shell so that the whole structure can be wrapped up to form a hot top.

Universal also relies upon Oglebay's prior art wet mud process. Since the early 1930's Oglebay has manufactured and sold reusable hot tops under the trade name "C & D Hot Tops," which hot tops in the form originally introduced and sold consisted of a hollow casing of cast iron within which is a reusable hard refractory lining (not brick) having an average life of 30 to 40 heats. Attached to the bottom of the casing by suitable wire spring clips is a refractory bottom ring which protects the bottom end of the casing and which must be replaced after each heat. Extending between the bottom ring and the inner

**1114**

surface of the ingot mold are sheet metal wiper strips, which also must be replaced after each heat and which prevent the molten steel from rising between the ingot mold and the hot top when the ingot is poured. Wooden blocks are provided for initially and adjustably supporting the hot top at the desired level in the upper end of the mold, and removal of these blocks after pouring of the ingot renders the hot top full floating.

At least as early as 1950, Oglebay began the manufacture and sale of another form of reusable hot top under the trade name "Low Volume C & D Hot Top" in which the hard refractory lining used in the original "C & D Hot Top" was replaced by a layer of lightweight insulating brick having higher heat insulating value. The use of lightweight insulating brick in Oglebay's "Low Volume C & D Hot Top" increased the insulating value of the hot top resulting in greater thermal efficiency and enabling the steelmakers to increase the yield from the ingots, but this lightweight porous brick, when subjected to molten steel, would have had a useful life of only one or two heats and was not of itself practical from a cost standpoint.

The lightweight porous brick was therefore provided with a protective lining emplaced in the hot top in the form of a wet mud approximately one-half inch in thickness extending over the entire interior surface of the insulating brick lining from the bottom ring to the upper end of the hot top. The wet mud protective lining is of a composition (including refractory and heat-destructible materials) such that when thoroughly dried, it forms a monolithic protective veneer strong enough to prevent penetration of the molten steel and of sufficient thickness to provide a temperature drop to a value which the insulting brick could withstand for thirty to thirty-five heats.

This protective veneer or lining and the bottom rings withstand only a single use, and, accordingly, it is necessary for the steelmaker to recondition the hot tops

after each use by cleaning the spent veneer from the hot top, applying a new bottom ring, applying a new coat of veneer-forming mud, and thoroughly drying the remade hot top to remove the moisture from the veneer. There are, however, inherent difficulties in the use of the wet mud process such as the time and labor required to recoat the insulting brick, the danger of nonuniform coating if done by hand, the expense of the complicated machinery necessary for reapplying the wet mud automatically, and the necessity of properly and thoroughly drying the wet mud before reusing the hot top.

### DIFFERENCES BETWEEN THE PRIOR ART AND THE PATENT IN SUIT

It is apparent from my study of the prior art references and the testimony of the expert witnesses concerning the scope of such prior art that while the individual elements of the Carpenter claims are embodied in one or more of the prior art references, no one prior art reference cited by the defendant discloses all of the elements of any one of the Carpenter claims. Nor does the prior art disclose or even suggest the use of these individual elements as part of a wrap-up insert unit for protecting the brick lining of a reusable hot top. I have also concluded that none of the prior art references provides anywhere near as satisfactory a solution to the problems of the hot top industry as does the Carpenter patent.

*Mueller Patent No. 3,039,158.* This patent was the culmination of research done by Mueller during 1952–53 as an employee of Oglebay's research and development department. The objective of Mueller's research was to eliminate the problems associated with Oglebay's previously developed wet mud process for reconditioning hot tops. Mueller attempted to develop a new method that would substitute for the wet mud veneer a plurality of precast and properly shaped panels that could be manufactured for individual insertion and fitting into a hot top

casing so as to provide a mechanical and heat damage protective barrier for the porous brick lining of the metal casing.

Although Mueller's objective was the same as that of Carpenter, the Mueller patent No. 3,039,158 differs from claims 1 through 3 of the Carpenter patent in two respects. Mueller teaches the use of individual panel inserts; it does not disclose the flexible interconnection of such panels so as to form an integral wrap-up panel insert unit such as is embodied in the Carpenter claims.

Second, the use of a heat-destructible binder is limited in the Mueller claims to the exothermic panel layer. Although the evidence indicates that Mueller tested panels composed of refractory material combined with a heat-destructible material, the Mueller patent does not disclose a heat-destructible binder as part of the refractory layer. In fact, Mueller concluded that the problems which he had encountered with his panels could not be solved merely by varying the panel composition.

Claims 4 through 6 of the Carpenter patent are further distinguishable from the Mueller disclosures in that claims 4 through 6 specifically suggest the use of corrugated cardboard as the flexible interconnecting material.

The Mueller patent has never been commercially adopted because of the structure's inadequacies—awkwardness of insertion, leakage between panels, and unsatisfactory stripping [7] characteristics. In short, Carpenter succeeded where Mueller failed.

*The British patent No. 776,290* may be similarly distinguished from the Carpenter patent in that the British patent No. 776,290 also does not disclose a

wrap-up insert unit, nor does it teach in any manner the flexible interconnection of the individual panel inserts by means of corrugated cardboard or other flexible material. A further distinction would appear to be the specific reference in the Carpenter claims to the use of a panel composition which includes a heat-destructible binder. While the British patent does mention the possibility of altering the panel composition "[w]here desirable * * * to include coke braise or equivalent carbonaceous material," this single reference, in and of itself, cannot be said to specifically disclose the use of a panel composition that includes a heat-destructible binder.

*The Eayrs patent No. 2,361,386,* unlike the Carpenter patent, pertains to a single-use hot top. In fact, only Mueller patent No. 3,039,158, British patent No. 776,290, and Oglebay's prior wet mud process pertain to a refractory lining designed to protect the brick lining of a reusable hot top casing.[8] A single-use hot top is of more basic construction, and its component parts are discarded (for hot top purposes) after a single pouring. Such a structure has neither an outer metal casing nor a porous refractory lining, and therefore the Eayrs patent is not concerned with the problems of protecting the brick lining of a reusable hot top from damage due to excessive heat or inadequate stripping. Nevertheless, the Eayrs patent does teach the use of flexible means to connect individual refractory panels. It does not suggest, however, that corrugated cardboard be used as the flexible material. Also, unlike the panels disclosed in the Carpenter claims, the Eayrs panels, when ready for use, do not include heat collapsible materials or a heat-destructible binder.

7. Stripping problems arise when sufficient sticking occurs between the sinkhead and the brick lining of a hot top so that forceful removal of the hot top may be required which is time-consuming and often causes damage to the brick lining of the hot top or sometimes to the ingot itself.

8. With regard to this and other prior art references, I will distinguish between a structure designed to function as a lining for a reusable hot top and an assembly which itself constitutes a hot top. In so doing, however, I am nonetheless mindful that there exists an element of equivalency as between these two types of structures.

*The Swedish patent (Wahlstrom) No. 142,479* teaches the use of individual insert panels to form either a single-use or reusable hot top structure adapted to rest in the notched upper end of an ingot mold. The claimed invention does not pertain to a wrap-up insert lining designed to protect the brick lining of a reusable hot top. Nonetheless, Wahlstrom does disclose a panel composition consisting of a refractory material having a heat-destructible binder as well as the use of corrugated cardboard as the backing material for such panels. On the other hand, the Wahlstrom disclosures do not suggest the mounting of several panels on a single piece of corrugated cardboard—or that if so mounted such panels should be so spaced and shaped as to permit wrapping up of the cardboard to form an insert liner with the edges of the panels in area contact. Nor do the Wahlstrom disclosures suggest that corrugated cardboard be used to serve any purpose other than to provide a corrugated back face and a reinforcement for the refractory material of each single panel.

Figures 1, 2, 8, and 9 of the *French patent (Vayda) No. 1,215,009* differ from the Carpenter patent in that they disclose a lining for use in the upper end of an ingot mold itself—not a lining for use in a reusable hot top. Figures 3 through 7 indicate a lining that may be used in either the upper end of an ingot mold itself or in a reusable hot top *without* a refractory brick lining.

It is not clear from the Vayda patent as to whether the structures shown in figures 1 and 2 employ one continuous lining element or separate lining panels. If the former is the case, impregnated cardboard, while flexible enough to be bent along the circumference of the mold, is not flexible enough to be bent or folded at the angles necessary to render the lining a wrap-up insert without cracking or breaking the backing material. If the latter is the case, the invention discloses separate panels and not an integral wrap-up insert unit. Figures 1 and 2 may be further distinguished from the Carpenter

disclosures in that neither of these figures indicate that the refractory material includes a heat-destructible binder. Figure 2 also differs from Carpenter in that the exothermic layer in figure 2 lies between the corrugated cardboard and the ingot wall, while in Carpenter the exothermic layer is positioned between the refractory layer and the molten steel.

The disclosures corresponding to figures 3 through 7 of the Vayda patent refer to both a single envelope and a plurality of envelopes. In the latter case, the disclosures do not make it clear whether the plurality of envelopes are joined in any manner prior to their insertion in the ingot mold. If the lining consists of a single envelope, and even if the inner side of the envelope is not impregnated, as suggested in one variation, the impregnated outer surface of the single envelope, like the continuous lining element of figure 1, would appear incapable of constituting a wrap-up unit due to the relative inflexibility of such an element. Likewise, if the lining consists of several unconnected envelopes, the invention does not disclose an integral wrap-up unit. If, on the other hand, the individual envelopes are joined in some undisclosed manner, and such undisclosed joinder were sufficiently flexible, then such a variation on the invention could constitute an integral wrap-up unit. In any event, however, none of the variations of figures 3 through 7 indicate that the refractory material used to impregnate the cardboard contains a heat-destructible binder.

Figures 8 and 9 of the Vayda patent disclose a "flexible belt" or lining for insertion in an unlined hot top assembly and consisting of exothermic plates mounted on corrugated cardboard which has been impregnated with a refractory material. This configuration, however, differs from the Carpenter disclosures in many respects. The cardboard backing disclosed in Carpenter is not impregnated and, therefore, is more flexible than the impregnated backing disclosed in Vayda. In fact, the latter, while

constituting a "flexible" backing, is not flexible enough that it could be bent at the angles necessary to render the structure a wrap-up lining without breaking or cracking the lining itself. Second, the Carpenter cardboard backing is interposed between the refractory lining of the hot top casing and the outer or refractory layer of the plates. In Vayda, by comparison, the cardboard backing is attached to the front or inner face of the plates so that it is directly exposed to the molten steel when the ingot is poured. Third, the panels in Vayda do not include a refractory layer. While the cardboard is impregnated with a refractory material, there is no indication that this material includes a heat-destructible binder. Fourth, while the disclosures corresponding to figures 8 and 9 of Vayda disclose that the exothermic plates are to be positioned on the cardboard backing in a side-by-side position, the disclosures do not indicate whether the plates are so arranged that when inserted in the ingot mold the adjacent edges of the panels will be in area contact so as to prevent any leakage of the molten steel.

*The British patent No. 832,555* is intended for use in a cylindrical, unlined hot top assembly or in the riser of an ingot mold. As such, it is not concerned with the problem of protecting the brick lining of a reusable hot top assembly as is disclosed in the Carpenter patent.

The British patent, while illustrating the use of flexible material to join individual refractory and/or exothermic strips, does not suggest the use of corrugated cardboard as a flexible backing material. Moreover, while in figures 4 and 5 of the British patent the strips are arranged so as to be in single edge abutment when in position for use, the strips are not arranged so as to provide area contact between the adjacent edges of the strips regardless of which way the supporting web is bent. This lack of area contact would render the British disclosure inadequate for protecting the brick lining of a hot top casing as is found in the Carpenter patent.

Furthermore, unlike the Carpenter disclosures, the British patent discloses neither the use of a refractory material with a heat-destructible binder in the strips or panels nor an insert unit for use in a tapered hot top assembly.

*The De Maison patent No. 3,106,756* discloses the use of a flexible or hinged backing for the mounting and support of refractory panels or lining. It makes this disclosure, however, not in the context of an insert unit designed to protect the refractory lining of a reusable hot top, but rather in connection with either a single-use hot top or a lining for a single-use hot top.

The Carpenter patent may be further distinguished in that De Maison does not disclose the use of corrugated cardboard as a flexible backing material or the inclusion of a heat-destructible binder in the refractory material, whatever its form. Nor does De Maison disclose a tapered unit, or panels with converging sides, or panels with area contact between the adjacent edges of the panels when placed in position for use.

The differences between the Carpenter patent and Oglebay's prior wet mud process that has been cited by Universal are readily apparent. The wet mud process does not involve the use of panels of any kind; it does not, therefore, teach the flexible interconnection of panels; nor can the application of a protective wet mud lining be said in any way to constitute the insertion of a prefabricated wrap-up insert lining.

## LEVEL OF ORDINARY SKILL IN THE ART AT THE TIME OF THE PATENT IN ISSUE

In determining the obviousness or nonobviousness of the claimed invention, the court is required to place itself in the position of a hypothetical person having ordinary skill in the hot top art at the time of the claimed invention. Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721 (1944); Gass v. Montgomery Ward & Co., 387 F.2d 129 (7th Cir. 1967); Walt Disney Productions

v. Fred A. Niles Communications Center, Inc., 369 F.2d 230, 234–235 (7th Cir. 1966).

Design of hot tops and their various functional elements is primarily the province of the research and development departments of companies which supply hot tops to the steel industry. Persons so employed are, without doubt, skilled in the art. While the laborers and supervisors who work with hot tops acquire a degree of familiarity with their functions and shortcomings, when it comes to determining the level of *ordinary* skill in the pertinent art, it would appear that in this instance we must restrict ourselves to that class in the industry whose primary objective is the research and development of the pertinent art. As a result, our hypothetical person, while not necessarily a patentee, possesses those educational and technical skills ordinarily found in persons working in the research and development departments of the hot top industry. Our hypothetical man will also possess a high degree of practical experience with the subject matter of his research.

■ In addition to such technical and practical expertise, a man skilled in the art is chargeable with knowledge of all of the prior art references in the field in which he is working and also of all devices in the field which have been in prior public use—L. S. Donaldson Co. v. LaMaur, Inc., 299 F.2d 412 (8th Cir. 1962)—and this is true whether or not he specifically knew of the existence of such prior art devices. Walker v. General Motors Corp., 362 F.2d 56, 60 (9th Cir. 1966); Armour Research Foundation v. C. K. Williams & Co., 280 F.2d 499 (7th Cir. 1960); Hobbs v. Wisconsin Power & Light Co., 250 F.2d 100 (7th Cir. 1957).

Thus, the man having ordinary skill in the hot top art is one with the educational background and experience normally found in the members of the industry's research and development departments and a familiarity with all prior art devices, both patented and oth-

erwise. It is against this standard of knowledge and skill that the obviousness or nonobviousness of the Carpenter innovation must be determined.

Having thus determined the scope and content of the prior art, ascertained the differences between the prior art and the claims at issue, and determined the level of ordinary skill in the pertinent art at the time of the claimed invention, it now becomes necessary for the court to rule on the issue of obviousness.

## PRESUMPTION OF VALIDITY

Our determination begins with Title 35 U.S.C. § 282 which declares:

"A patent shall be presumed valid. Each claim of a patent (whether in independent or dependent form) shall be presumed valid independently of the validity of other claims; dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting it."

■ Since there is a presumption which attaches to a Patent Office grant, the party alleging the invalidity of a patent has the burden of proof which he must establish by clear and cogent evidence. Ortman v. Maass, 391 F.2d 677 (7th Cir. 1968); Walt Disney Productions v. Fred A. Miles Communications Center, Inc., 369 F.2d 230, 234 (7th Cir. 1966); Copease Mfg. Co. v. American Photocopy Equipment Co., 298 F.2d 772, 777 (7th Cir. 1961); Artmoore Co. v. Dayless Mfg. Co., 208 F.2d 1, 3 (7th Cir. 1953).

■ But Universal contends that the Carpenter patent is not entitled to this statutory presumption of validity because pertinent prior art references were not cited or considered by the Patent Office. In so doing, Universal relies on that line of authority which holds that there is little, if any, presumption of validity as against relevant prior art not shown to have been considered by

the Patent Office.[9] Howe v. General Motors Corp., 401 F.2d 73 (7th Cir. 1968); Novo Industrial Corp. v. Standard Screw Co., 374 F.2d 824 (7th Cir. 1967); T. P. Laboratories, Inc. v. Huge, 371 F.2d 231 (7th Cir. 1966); Skirow v. Roberts Colonial House, Inc., 361 F.2d 388 (7th Cir. 1966).

The Patent Office records contain no express reference to Mueller patent No. 3,039,158 or British patent No. 776,290, patents which this court has found to constitute a part of the relevant prior art.

As the court concluded earlier, the individual elements of the Carpenter claims are embodied in one or more of the prior art references, but no one prior art reference discloses a combination which contains all of the elements of any one of the Carpenter claims. Where such is the case, it cannot be said that any one prior art reference is more pertinent than another, for to the extent that prior art references disclose elements of the Carpenter combination not disclosed in the other references, they may be said to be equally pertinent. Rather, it would appear logical to conclude that a combination patent is not entitled to a presumption of validity as against uncited prior art which discloses elements of the claimed combination not to be found in the Patent Office references of record, as shown to have been considered by the Patent Office.

A comparison of Mueller patent No. 3,039,158 and British patent No. 776,290 with the prior art references cited or considered by the Patent Office reveals that these two patents not only disclose elements of the Carpenter combination not found in the Patent Office references, but also disclose combinations containing a greater number of the elements comprising the Carpenter combination than any of the combinations contained in the Patent Office references. Therefore, this court is of the opinion that the Carpenter patent is not entitled to a presumption of validity as against Mueller patent No. 3,039,158 and British patent No. 776,290. In so holding, the court believes that its ruling is consistent with recent authority in this area. See Howe v. General Motors and related authorities cited, supra.

■ As to Oglebay's contentions that Mueller patent No. 3,039,158 and British patent No. 776,290, or the subject matter thereof, was in fact considered by the Patent Office, the fact that Mueller patent No. 3,039,158 is classified in Class 22, Subclass 147, the same class and subclass that the examiner searched and in which he found every one of the United States patents which he cited, does not give rise to an inference that the examiner studied the Mueller patent and discarded it as adding nothing to the prior art which he chose to cite. On the contrary, the Seventh Circuit Court of Appeals has made it clear that "there is no presumption that a patent is valid as embodying an invention over pertinent prior art not cited or considered by the Patent Office. * * * There can be no presumption that the examiner reviewed and discarded it. It is more likely that he missed it." A. R. Inc. v. Electro-Voice, Inc., 311 F.2d 508, 512–513 (7th Cir. 1962). See Milton Manufacturing Co. v. Potter-Weil Corp., 327 F.2d 437 (7th Cir. 1964.) [10]

Nor does the court agree with Oglebay's contention that certain statements in the Carpenter application constitute

---

9. Failure to call the attention of the Patent Office to nonanticipatory, prior art or prior art no more pertinent than that already cited to the Patent Office does not, however, constitute a fraudulent representation before the Patent Office. Canaan Products, Inc. v. Edward Don & Co., 273 F Supp. 492, 501 (N.D. Ill.1966).

10. Canaan Products, Inc. v. Edward Don & Co., 388 F.2d 540 (7th Cir. 1968), affirming 273 F.Supp. 492, 501 (N.D. Ill.1966), may be distinguished on the ground that the lower court's conclusion was limited to prior art patents "called to the attention of" the Patent Office.

a disclosure of these two patents. Rather, the court believes that these general references as to what is shown in the prior art fall far short of suggesting the specific constructions and teachings of Mueller patent No. 3,039,158 and British patent No. 776,290.

### OBVIOUSNESS

■ While combinations of prior art obvious to one skilled in the art are not patentable, a combination of old elements in a manner that is unobvious to one skilled in the trade and which produces a new and useful result may be patented. Graham v. John Deere, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Ortman v. Maass, 391 F.2d 677 (7th Cir. 1968); Welsh Co. v. Chernivsky, 342 F.2d 586 (7th Cir.), cert. denied 382 U.S. 842, 86 S.Ct. 68, 15 L.Ed.2d 83 (1965).

Defendant argues that it would have been obvious to a man having ordinary skill in the hot top art in 1962 (1) to make the panels of either Mueller or British patent No. 776,290 heat destructible as taught by Oglebay's own wet mud process or by Swedish patent No. 142,-479 which teaches a panel consisting of a refractory material bonded by a heat-destructible binder and mounted on corrugated cardboard; (2) to use flexible materials, as shown by any one of Eayrs No. 2,361,386 (flexible wire), French (Vayda) No. 1,215,009 (flexible corrugated cardboard), British No. 832,555 (wire, fabric, asbestos, or the like), or De Maison No. 3,106,756 (flexible metal tape, hinges), to hingedly interconnect such individual and separate panel members for use not as a hot top as is the teaching of these prior art references but as a lining for a reusable hot top; and (3) to specifically achieve such joinder by means of flexible corrugated cardboard as taught by the French (Vayda) No. 1,215,009 patent, or as inferred from the use of cardboard panel backing in the Swedish (Wahlstrom) No. 142,479 patent.

In essence, defendant seeks to invalidate the Carpenter patent by establishing the existence of the various elements of the Carpenter combination in the prior art (relying primarily on prior art pertaining to hot tops as such and not to linings for reusable hot tops), and then modifying and realigning these established elements in accordance with the teachings of hindsight to arrive at the Carpenter combination. But as has been frequently stated and as found in Eversharp, Inc. v. Fisher Pen Co., 204 F. Supp. 649, 662–663 (N.D.Ill.1961):

"In order for one to defeat a meritorious patent it is not enough to pick out isolated features in earlier prior art patents, combine them in one particular way with hindsight acquired only from the patent under attack, and then say that no invention would have been involved in selecting those particular features and combining them in the particular way in which the patentee did."

■ It is my opinion, after an extensive examination of each of the prior art references considered in light of the expert testimony and after comparing each of the Carpenter claims to the teachings of such prior art, that none of the prior art patents relied on by Universal, singly or considered together, disclose or teach the combinations of elements called for in claims 1 to 6 of the Carpenter patent in suit, and that these claims define new combinations of elements which were not obvious to one having ordinary skill in the art at the time the invention was made. Although the prior art suggests all of the individual elements which make up the Carpenter combination, the prior art does not disclose or even suggest the use of these individual elements as part of a wrap-up insert unit for protecting the brick lining of a reusable hot top. The prior art fails to render the claimed invention invalid as obvious because the prior art does not suggest the Carpenter combination itself. Matherson-Selig Co. v. Carl Gorr Color Card, Inc., 301 F.Supp. 336 (D.C.N.D. Ill.1967).

As was recently stated in National Dairy Products Corp. v. Borden Company,

394 F.2d 887, 892 (7th Cir. 1968) [citing Zegers v. Zegers, Inc., 365 F.2d 156, 159 (7th Cir. 1966), cert. denied 385 U.S. 948, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966)]:

> " ' * * * the fact that the solution to a problem is simple, or appears so, when viewed in retrospect, does not mean the solution was obvious when it was made, and * * * courts must guard against the exercise of hindsight in assessing the obviousness of a given improvement in the art.' "

As a further but secondary consideration, I have taken into account the steel industry's long-felt but unsolved need for a hot top assembly which would provide a high degree of heat insulation, low cost, simplicity of handling and installation at the steel mills, prefabrication, economy and safety in shipping, i. e., minimal breakage, and satisfactory operation during pouring, solidification, and stripping of the ingots. Graham v. John Deere Co., 383 U.S. 1, 36, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Rex Chainbelt, Inc. v. General Kinematics Corp., 363 F. 2d 336 (7th Cir. 1966).

Recognition of this overall problem for many years immediately preceding the Carpenter invention is expressed in various language of the following United States patents: De Maison No. 3,106,-756; Daley No. 2,890,504; Marburg No. 3,026,585; Cooper No. 2,869,191; Edmonds No. 2,925,637; Nouveau No. 2,-841,843; Nouveau No. 2,821,000; and in the following foreign patents: Swedish (Wahlstrom) No. 142,479; British No. 776,290; British No. 832,555; and French (Vayda) No. 1, 215,009—all cited by Universal.

The evidence indicates that none of the prior art references made any significant impression on the art or ever resulted in a commercially practical solution to the industry's problem. While commercial success is not necessary for a patent to constitute prior art, lack of it in this case does tend to indicate that a solution to the problem was not obvious to those working in the industry in and prior to 1962. Rex Chainbelt, Inc. v. General Kinematics Corp. supra. More specifically, the solution was not even obvious to the members of Oglebay's own research and development department who, despite prior experimentation, did not hit upon the Carpenter combination. Mueller, for example, despite years of research concluded that panels should be inserted into the hot tops by a mandrel and, further, that stripping problems could not be overcome merely by varying the composition of the panels, but that a separate coating of graphite or the like would be necessary to achieve satisfactory stripping. Thus, as was the case in National Dairy Products Corp. v. Borden Company, 394 F.2d 887, 890 (7th Cir. 1968), "despite the knowledge and skill of" Mueller and his co-workers "their experiments led them away from the" Carpenter structure.

In contrast to the failures of the prior art, the Carpenter wrap-up insert unit filled the long existing need. It provides a wrap-up insert unit that can be manufactured and shipped as a unit, that can be stacked for shipment in a flat condition on pallets with little waste space, that is self-protective against mechanical damage during shipping and handling without the necessity of other resilient packing material, that can be quickly wrapped up and easily inserted into a hot top having an insulating brick lining, that protects the brick lining against leakage of steel and against heat and mechanical damage, that reduces the total time required to recondition a hot top for subsequent use from a period of about 4 to 5 hours to a period of about 30 minutes, thus effecting a substantial saving in labor, and that provides for stripping of the hot top from the ingot without damage to the insulating brick lining or delays caused by sticking of the lining to the sinkhead of the ingot.

The foregoing opinion sets forth my findings of fact and conclusions of law in accordance with Rule 52, Federal Rules of Civil Procedure. The plaintiff is requested to draft the necessary order for judgment for the plaintiff and

against the defendant on the question of patent validity in accordance with this opinion and submit it to this court for my signature after having it approved as to form by the defendant.