**ANDIS CLIPPER CO., Plaintiff,**

v.

**OSTER CORPORATION, Defendant.**

No. 72–C–107.

United States District Court,
E. D. Wisconsin.

Dec. 14, 1979.

Walther E. Wyss, Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., for defendant.

Robert E. Clemency, Michael, Best & Friedrich, Milwaukee, Wis., for plaintiff.

MEMORANDUM AND ORDER

WARREN, District Judge.

## I. INTRODUCTION

This is a patent suit wherein the plaintiff Andis Clipper Co. (Andis) alleges infringement by the defendant Oster Corporation (Oster) of United States Patent No. 3,101,-535 belonging to Andis. That patent was granted with reference to a set of hair clipper blades with laterally extending tooth bars. Jurisdiction is grounded on 28 U.S.C. § 1338 and venue is conceded to be proper.

Only Claim 3 of the patent in suit is alleged to be infringed. Plaintiff stated in court on the record at the outset of trial that if Claim 3 is held invalid, the plaintiff will disclaim other claims. Plaintiff further indicated that should Claim 3 be held valid but not infringed, it will never thereafter charge infringement on any of the other claims. Thus, Claims 1 and 2 are out of the suit except insofar as Claim 2 may be relevant in considering the questions of anticipation or obviousness.

This case presents issues of validity and infringement. Plaintiff not only claims that the defendant infringed plaintiff's patent, however, but also that defendant did so knowingly, willfully, and maliciously. Furthermore, there is a claim for attorney's fees.

Trial to the Court was held commencing June 27, 1975, and consumed approximately six days. At the conclusion thereof, the Court took the matter under advisement and requested post trial briefs as well as

proposed findings. Pursuant to Rule 52(a), Federal Rules of Civil Procedure, this memorandum and order shall constitute the Court's findings of facts and conclusions of law on the issues herein.

## II. GENERAL BACKGROUND

The plaintiff, Andis Clipper Co. is a corporation organized and existing under the laws of the State of Wisconsin with its principal place of business at 1718 Layard Avenue, Racine, Wisconsin. Matthew L. Andis, son of the patentee, and his sister, a Mrs. Dunn, each own approximately 50 percent of the corporation.

The defendant, Oster Corporation is a corporation organized and existing under the laws of the State of Wisconsin with its principal place of business at 5055 N. Lydell Avenue, Milwaukee, Wisconsin. Oster is a wholly-owned subsidiary of Sunbeam Corporation.

Both Andis and Oster are engaged in the manufacture and sale of blade sets and hair clippers and have been competing in the market of sales to professional barbers since the middle 1920's. Andis sells exclusively to professional barbers, while Oster sells to both the professional market and the public at large.

Hair clippers or hair cutting mechanisms commonly have blade sets which are generally rectangular and are comprised of a shear plate extending laterally with a series of teeth extending along the forward edge of the body portions thereof; a movable blade likewise extending laterally and having a series of teeth along the forward edge of the body portion thereof; and, bearing surfaces which support and guide the movable blade for lateral reciprocation on the fixed blade or shear plate. In operation, the movable blade is reciprocated along the shear plate to effect hair cutting, either manually in a hand operated device, or by an electric motor in the more modern versions.

Hair clippers may have teeth which the parties have denominated clipper teeth, that is, being separated by spaces which diverge forwardly so that the openings to the spaces are considerably wider than the width of the teeth tips so as to facilitate feeding of the hair for cutting. It should be noted, however, that, although figures 2 and 3 of the patent at issue show such clipper teeth, the language of Claim 3 of the patent contains no such description and some of the pertinent prior art involves a design with teeth and spaces of uniform width.

The invention of the particular blade set in suit was made by Matthew G. Andis about 1961. On March 14, 1962 he filed a patent application entitled "Blade Assembly with Lateral Extensions" and on August 27, 1963, U.S. Patent No. 3,101,535 was issued for a set of hair clipper blades with laterally extending tooth bars. (See Appendix)

All right, title and interest in and to the Andis patent in suit, including the right to bring suit for infringement of the claim of said patent, has been assigned by Matthew G. Andis to the plaintiff company.

Commencing in November of 1967, plaintiff first sold hair cutting devices known as T-edgers, which used a blade set covered by the patent in suit. It subsequently developed and sold a number of additional devices using a similar blade set. Throughout the course of the trial, both sides began the practice of referring to those hair cutting devices of plaintiff's that used the patent in suit as T-devices (i. e., T-edger, T-outliner, and T-liner).

The Andis '535 patent (PX 1; DX 87) is directed to a blade set comprising two main elements in Claims 2 and 3: (1) a shear plate or stationary cutting blade; and (2) a movable blade or cutter. The claims do not specify the size or shape of either blade although they do specify that each has cutting teeth along its forward edge. The shape of the teeth is not described. The improvement over the prior art is alleged to be the addition to the cutting elements of "lateral extension bars."

The specifications of the '535 patent also set forth that an objective of the invention is:

> To provide such extensions on an otherwise standard blade set, thereby making the conventional broad or widely spaced bearing surfaces effective to control the movement of the extensions of the respective blades. . . .

The specifications also contain the contention that the blade assembly with lateral extensions:

> [R]esults in greatly increasing the length of the series of teeth, and the teeth at both sides of the blade are on very narrow bars which can be introduced into the nostrils or ears to remove superfluous hair.

Thus, the specification points to use in the nostrils and ears and also the implied increase in the cutting capacity by virtue of the increase in the frontal length of the series of teeth.

Although none of the claims of the patent in suit are limited to a barber's clipper as such and the specifications likewise appear to be unlimited, it became clear during trial that the T-shaped blade set has its greatest utility in outlining or trimming human hair as a part of the hair cutting process. It is used particularly above and behind the ears and at the nape of the neck.

As indicated above, at the outset of the trial, to simplify the issues, the parties stipulated that plaintiff limited its claim of infringement to Claim 3 of the patent in suit and agreed that if the patent were to be found invalid it would disclaim Claims 1 and 2. It was also agreed that if the patent was found to be valid but not infringed, it would never claim infringement as to Claims 1 or 2.

Although the drawings and descriptions disclose the lateral extensions on both ends of the two blades, and Claims 1 and 3 require extensions on both ends, Claim 2 is sufficiently broad to cover a blade set with extensions at only one end:

*Claim 2*

> A hair clipper blade set comprising a shear plate having a body portion with a transversely extending forward edge, a narrow extension bar projecting laterally from the side of said body portion adjacent said forward edge with its forward edge in substantially rectilinear alignment with said forward edge of said body portion, a series of teeth extending along said forward edges of said body portion and of said extension bar, and a rectilinearly extending bearing surface disposed adjacent to said teeth along said body portion and said extension bar, and a movable blade mounted for transverse reciprocation on said shear plate, said movable blade having a body portion, an extension bar, a series of teeth, and a bearing surface, said extension bar, teeth, and bearing surface of said movable blade being complementary to said extension bar, teeth, and bearing surface of said shear plate.

*Claim 3*

> A hair clipper blade set comprising a shear plate having a body portion with a transversely extending forward edge, a narrow extension bar projecting laterally from each side of said body portion adjacent said forward edge, each extension bar having its forward edge in substantially rectilinear alignment with said forward edge of said body portion, a series of teeth extending along said forward edges of said body portion and of said extension bars, and a rectilinearly extending bearing surface disposed adjacent to said teeth along said body portion and said extension bars, and a movable blade mounted for transverse reciprocation on said shear plate, said movable blade having a body portion, a pair of oppositely projecting extension bars, a series of teeth, and a bearing surface, said extension bars, teeth, and bearing surface of said movable blade being complementary to said extension bars, teeth, and bearing surface of said shear plate.

Claim 2 is henceforth considered only as it may relate to anticipation or obviousness.

The introductory part of each of the three claims of the '535 patent calls for a "hair clipper blade set" without any indication as to whether the patent claims run to human or animal hair, or both. Nor do the claims set forth the type of hair to be cut,

whether it be short, stiff, beard hair or long, limp hair such as that found on the back of the head. Yet, this very issue was debated vigorously and at length by the respective counsel.

None of the claims of the patent in suit recites that the blade set is to be utilized for trimming or outlining at the sideburns or neck or behind the ears and the patent contains no disclosure of any such use. Furthermore, the claims are not limited to a barber's clipper and the specification does not refer to or describe such a clipper. One of the devices accused to infringe (PX 106) is sold to the home market.

The claims do not recite any motor or housing or any particular relationship between the width of the blade set and any housing. There is no disclosure in the patent that any part of the blade set should extend beyond the sides of a hair cutter housing. In fact, the specification states that the "clipper is of the general type shown in Pat. No. 2,959,855 (Andis Patent; DX 87) which reveals a clipper with a motor housing considerably wider than the blade set." However, the Court is satisfied that in terms of production models and alleged infringing devices, the embodiment generally involves a blade set wider than the housing, or at least wider than the housing is at the point of junction with the blade set.

In many of the barber hair clippers in the prior art, the sides and front of the shear plate and of the movable blade have merged into a corner which, as shown in Noble Pat. No. 299,836 (PX 63) and an early hand clipper (PX 158), was formed either by a right angle or by a rounded right angle. Such "square cornered" clippers hindered access to restricted places and hindered visibility, particularly when trimming or outlining around and behind the ears.

The Need Pat. No. 2,641,833 (PX 162) and the Prueter Pat. No. 2,860,413 (PX 163), both cited by the Patent Office as prior art, are both illustrative of blade sets with such "square corners." The Spencer Pat. No. 1,491,320 (PX 87), a file wrapper reference, discloses a combined clipper, comb and shears including two toothed members 6 and 10 which are rectilinearly reciprocal relative to each other by scissor-like movement of the handles 1 and 2. The outer end portion of both tooth members 6 and 10 is reduced in size and constitutes a narrow extension of the blade set.

The Court does not find the Need, the Prueter, or the Spencer patents especially pertinent prior art and will therefore not discuss them further.

During the trial, various embodiments of the T-blades were demonstrated to show certain advantages which inure to T-blades such as (1) greater visibility; (2) the possibility of using a small and compact housing; (3) free-fall of cut hair; and, (4) the choice of using either lateral extension for trimming. The patent in suit discloses none of these.

Barbering and hair cutting has evolved through the years with hand clippers and straight razors being replaced by motorized clippers and motorized trimmers or shavers. Before and since 1955, Andis and Oster both sold power clippers used by the barber to do the bulk of a haircut. Such heavy duty clippers with detachable and interchangeable blade sets are demonstrated by DX 1, PX 57, PX 58, and PX 60.

In 1955, Andis, in an effort to meet the trimming and finishing market, produced its Outliner (PX 111). Three Andis patents issued to Matthew G. Andis (2,790,236–DX 87; 2,704,887–PX 70 and DX 87; 2,875,519–PX 71 and DX 87) covered the Outliner. All three patents taught all the claims of '535 except the lateral extensions of the blade set. Later, an Outliner II was produced. Beginning in 1963, Andis began selling light trimming clippers known as Edgers.

In late 1961 or early 1962, Matthew G. Andis described to an employee, Gregor Lonne, how he would like to have a production blade set altered to have narrow lateral extensions on the blade set. The blade set drawings used by Mr. Lonne were like those for the prior art Outliner and like Fig. 4 of the '236 patent. In January, 1962, plaintiff's patent counsel took the drawings and

made a search of the prior art in the Patent Office preparatory to an application for Letters Patent.

During the course of this search, five prior art patents were uncovered including Boyd Pat. No. 2,336,160 (DX 87). The searcher did not bring the Spencer patent to plaintiff's attention, although it did do so with Boyd. Plaintiff did not call the Boyd patent to the attention of the Patent Office Examiner who was examining the application. Nor did plaintiff cite the Andis '236 patent, which discloses a blade set identical to '535 except for the lateral extensions, to the Examiner.

The Patent Office Examiner initially rejected all those claims of the applications as unpatentable over Need U.S. Pat. No. 2,641,833 (PX 162; DX 88) and Prueter U.S. Pat. No. 2,860,413 (PX 162; DX 88) in view of Spencer U.S. Pat. 1,491,320 (PX 160; DX 88). The Examiner cited no other prior art.

In rejecting the original claim, the Examiner noted (File Wrapper, PX 160 p. 10):

> Claims 1–3 are rejected as unpatentable over Need and Prueter in view of Spencer. Need and Prueter show hair clippers whose blades have complementary bearing surface that are widely spaced (the front and back edges of the movable blade and Prueter further shows a lateral spacing along the rear). Spencer shows a hair clipper that has a cutting extension of reduced depth than the main blade section at the free end. To provide the blades of the clippers of Need and Prueter with cutting extensions of reduced depth at the ends after the disclosure of Spencer is not considered to involve invention.
>
> No claim is allowed.

Need and Prueter disclosed blade sets without any lateral extensions. Apparently because the examiner construed the Spencer patent to show "a hair clipper" with a narrow cutting extension, he held the combination of these two concepts to be not patentable. After the rejection, plaintiff's patent counsel amended the claims and received allowance of the application.

The '535 patent was issued August 27, 1963. The patent lay dormant until November of 1967 when the first device with a T-blade was sold by Andis. This was actually the so-called T-Edger. It should be noted that this first commercial sale by plaintiff was a T-blade set not attached to an '855 housing (the Outliner uses such a housing) as disclosed in patent '535, but rather to the small more compact housing exemplified by PX 113.

During February of 1967, Harvey R. Starke of defendants Barber and Beauty Division sent an Oster interhouse memo to A. Bate, R. F. Draper, G. W. Orr and R. W. Wallace requesting the development of a new product (PX 6). It asked for "A small 'Finisher' clipper to compete with the Andis Outliner. . . . " Then on March 16, 1967, Starke followed up with another request (PX 7) to Alan Bate, Oster's vice president-engineering and chief engineer. He urged that a part of the consideration should be an effort to make a 5/8 size blade.

Bate prepared a request for authorization for "A small 'Finisher' clipper to compete with Andis Outliner." The request was approved and authorization for development granted by Robert Draper, president (PX 9).

On August 14, 1969, as part of the ongoing discussion and development of Oster's new finisher clipper, Starke sent a memo to Sam Rogers of Oster setting forth various features he felt should be incorporated in the new product and noted:

> The Andis T-Edger seems to be most successful because of its shape. We should work in this direction. (PX 10)

By letter dated during July, 1970, from the patent department of Oster's parent corporation, an opinion was sought from counsel as to the validity of the patent in suit. An opinion rendered August 1, 1970 (PX 100) advised defendant that the '535 patent was invalid because of obviousness in the face of prior art, particularly Boyd Pat. No. 2,336,160 (DX 87).

In the face of defendant's imminent movement into the market of its "Finisher"

Model 59 (PX 18) with orders allegedly being taken for delivery April 1, 1972, plaintiff sent three letters (PX 2, 3, and 4) to defendant charging infringement. These were ignored and the initial complaint herein was filed February 22, 1972.

The parties stipulated as uncontested that defendant began selling its Oster Finisher hair clipper (Model 59; PX 18) subsequent to the time the original complaint was filed on February 22, 1972, but prior to the filing of the supplemental complaint herein.

## III. VALIDITY

The true battle in this litigation swirls around the validity of the patent. The parties agree that 35 U.S.C. § 282 provides for a presumption of validity to attach to an issued patent and that the burden of establishing invalidity rests on the party asserting it. That burden is one requiring clear and convincing evidence.

The presumption of validity attaches to each claim of a patent independently of the validity of any other claims of the patent.

Patentability arises, of course, by virtue of Art. I, Sec. 8 of our Constitution, which provides, in part, that Congress shall have power:

> To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries;

The "legal creature" which our Founding Fathers created by this provision was given body and muscle by the statutory provisions of Title 35 of the United States Code.

There is no "common law" of patents; thus, we find guidance for determining patent disputes within the four corners of that chapter of the code, and more particularly, within 35 U.S.C. § 101, which lays down the requirement that for inventions to be patentable the claims must define subject matter that is *new* and *useful*. For well over a century after the Patent Act of 1836, this was all the statutory law required. There existed no qualitative measure of patentability for new inventions. There may well have been some further yardstick lurking in the earlier case law but, at any rate, the concept of a "requirement for invention" became associated with the statute by the famous case of *Hotchkiss v. Greenwood,* 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1850). To be patentable, courts said, an invention had to involve "invention." Thereafter patent opinions dealt at great length with what constituted this elusive concept, "invention." The literature of patent law textbooks and court opinions were full of discussions about the "standard of invention" required to validate a patent. Judges delighted in developing their ideas on the subject. But in the final analysis, it seemed that, if the Patent Office or a court was persuaded that an invention was patentable, then it was an invention.

Obviously, this state of confusion was not conducive to clear reasoning. During the 1940's and 1950's, pressure developed, particularly on the congressional committee responsible for reviewing the various statutes. As a result, a coordinating committee, complete with its own drafting committee, was set up to revise Title 35.

While proposals to deal with the requirement for "invention" were being bandied about, the Supreme Court handed down *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.,* 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). The committee was so horrified at the convoluted and tortured reasoning regarding "invention" that a decision was made to cut loose altogether from the old term "invention." The result was 35 U.S.C. § 103's requirement that:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

Patentability shall not be negatived by the manner in which the invention was made.

For numerous years, many patent lawyers and even the Patent Office ignored the "non-obvious" requirement of § 103. Then, in 1966, the Supreme Court decided three cases which have become known as "The Trilogy," *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), decided together with *Calmar, Inc. v. Cook Chemical Co.* and *United States v. Adams,* 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). In these cases, the Court held § 103 to be a constitutional exercise of legislative power and it was construed as follows:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. *Graham v. John Deere Co.,* 383 U.S. at 17, 86 S.Ct. at 694.

Some patent lawyers view *Anderson's Black Rock, Inc. v. Pavement Salvage Co., Inc.,* 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969) as in some fashion undoing *Graham, supra,* and reverting to the old "invention" test, but the better analysts, while recognizing some inconsistencies regard the cases as jointly operative and the "non-obviousness" test as the correct interpretation of § 103.

Out of this historical growth of patent law, both statutory and case, flow three general requirements for patentability: (1) newness (novelty) and usefulness (utility) under § 101; (2) non-existence of any of the conditions defeating patentability under § 102 (including anticipation); and (3) non-obviousness under § 103. The Court will address the requirements of these factors and then apply the rules set forth to the facts of this case.

A. *NEWNESS AND USEFULNESS*

Under 35 U.S.C. § 101:

Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

The "newness" or novelty required under this provision has been defined hundreds of ways in the case law, many of which lean heavily upon that now inappropriate word "invention." Black's Law Dictionary instructs us that:

In order that there may be "novelty" so as to sustain a patent, the thing must not have been known to anyone before, mere novelty of form being insufficient. *See Seaver v. Wm. Filene's Sons Co.,* 37 F.Supp. 762, 765. (D.Mass.1941) Black's Law Dictionary at 1213 (4th Ed. 1968).

This Court views a consideration of "newness" or "novelty" to require addressing the same factors as the parties addressed in their discussion of anticipation under 35 U.S.C. § 102. The presence or lack of the requisite "novelty" turns upon one's determination of the presence or absence of anticipation determined hereafter.

The defendant conceded that the claimed subject matter meets the "useful" test.

B. *ANTICIPATION*

Section 102 of the Patent Act sets forth those factors, which, if found, defeat the patentability of an invention.

The two subsections most pertinent to this case provide:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or . . .

35 U.S.C. § 102(a) and (b).

Thus, anticipation precludes a patent when there is a lack of novelty because the same or substantially the same invention was known or in public use before the invention in question; or the invention was on sale more than one year prior to the application for the patent in suit.

"To anticipate a patented improvement, the prior art material must exhibit a substantial representation of the patented improvement." 1 A, Deller, Walker on Patents § 57 at 238 (2d ed. 1964). Corpus Juris instructs that,

> Two inventions are identical in substance if they perform substantially the same function or office in substantially the same way and produce substantially the same result. They are not identical in substance if they accomplish substantially different results, or perform different functions, or if they perform the same functions in a different way. 48 Corpus Juris § 27 (1929).

The parties differ vociferously as to the meaning of this factor of substantial identity. Plaintiff cites *Shelco, Inc. v. Dow Chemical Corp.*, 466 F.2d 613 (7th Cir.), *cert. denied,* 409 U.S. 876, 93 S.Ct. 125, 34 L.Ed.2d 129 (1972), for the proposition that in this circuit there must be essential structural and functional identity to achieve anticipation and argues that the prior art principally relied upon by defendant, Boyd Pat. No. 2,336,160 (PX 62), is so structurally and functionally different from the invention of claim 3 as to preclude anticipation. Defendant cites the same case as saying:

> However, when the only features distinguishing the purported invention from a prior art product are insubstantial, *the earlier may properly be said to anticipate the later product.* As we said in *Deep Welding, Inc. v. Sciaky Bros., Inc.,* 417 F.2d 1227, 1234 (7th Cir. 1969), *"[I]t is sufficient for anticipation 'if the general aspects are the same and the difference in minor matters is only such as would suggest itself to one of ordinary skill in the art.'"* (emphasis added) 466 F.2d at 614.

Defendant's claim of anticipation runs to the Boyd Pat. No. 2,336,160 (PX 62); the Harlow Pat. No. 65,077 (DX 87); and Rush Pat. No. 2,074,239 (DX 87).

The *Shelco* quotation, in its reference to *Deep Welding,* thus lays down the first of three touchstones to determine anticipation. Reference to the *Deep Welding* opinion provides the other two:

> *Secondly, even though the disclosures of the prior art may fall short of 'complete anticipation,' anticipation may be found where achieving complete anticipation only required that one of ordinary skill in the art merely exercised that skill to complete the work. Leishman v. General Motors Corp.,* 191 F.2d 522, 530–531 (9th Cir. 1951). *Thirdly, while it is preferable that 'all of the elements of the patented device or their equivalents * * * be found in a single prior device,' it is sufficient for anticipation 'if the general aspects are the same and the difference in minor matters is only such as would suggest itself to one of ordinary skill in the art.'* 417 F.2d at 1234.

The Court in reading the assertion of claim 3 of Andis '535, against the Harlow device finds a lack of identity of structure because Harlow does not have extension bars such that each bar has "its forward edge in substantially rectilinear alignment with said forward edge of said body portion." (See Element No. 2, DX 101.) The transversely extending forward edge with the narrow extension bars extending from each side of the body portion of both the shear plate and the movable blade is, in each instance, arcuate in nature rather than rectilinear. The Court likewise fails to find "a rectilinearly extending bearing surface. . . ." See Element No. 4, DX 101. "Rectilinear alignment" and "rectilinearily extending" require straight line movement. Because of this lack of structural identity, Harlow does not anticipate Andis '535.

Comparing claim 3 of Andis '535 against the device embodying Rush Pat. No. 2,074,-239 (DX 87), the Court also finds a lack of structural identity because there is no "narrow extension bar projecting laterally from

each side of said body portion adjacent said forward edge" (See Element No. 2, DX 101) and no "pair of oppositely projecting extension bars (See Element No. 6, DX 101) in the Rush patent. The so-called extension bars of the Rush invention are co-extensive with the shear plate, the bearing surface and the movable blade. Hence, there are no "extensions."

Defendant relies heavily upon the Boyd Pat. No. 2,336,160 (DX 87) as prior art for both its anticipation and obviousness arguments. Although the Court considered the question of structural identity at length, it finds that, at least as to anticipation, it need not resolve the issue because it finds a lack of functional identity. The Boyd device is utilized for a shaving operation closely adjacent to or in the human nose, or in other similarly restricted areas. The patent in suit deals with a hair clipper used for outlining and trimming. To be sure the specifications of the patent in suit tells in terms of removing superfluous hair from the nostrils and ears, but, in fact, its utilitarian function is that of outlining and trimming.

Plaintiff, who insists on calling devices such as the Boyd patent (PX 62) shaving heads, argues vehemently that blade sets and shaving heads are neither functionally or structurally the same. He argues that a shaving head constitutes an internal cutting mechanism protected by an outer guard having narrow slots or small openings which guard against injury to the person shaving and which materially inhibit passage there through of all but relatively stiff stubble. Plaintiff contends that a blade set, on the other hand, constitutes an external cutting mechanism including at the front thereof, an exposed series of clipper teeth which taper and which have relatively widely spaced points or ends to permit free entry of all types of hair between the teeth. A shaving head is not adapted to hair cutting as such, or to cutting long limp hair. Although recognizing the similarities of the claims 2 and 3 of Andis '535 and of the Boyd device, having assessed them in the light of the requirements of anticipation, the Court finds that the differences in utilization or function are such that the Boyd device does not anticipate claim 2 or claim 3 of that patent in suit. Having disposed of the identity issue regarding each of the alleged anticipatory devices, the Court finds no anticipation.

C. *NON-OBVIOUSNESS*

New and useful subject matter complying with sections 101 and 102 and possessing statutory newness and statutory usefulness must satisfy a third condition or factor under the Patent Act of 1952. "This condition requires the subject matter when (1) taken as a whole; (2) to be non-obvious; (3) to a person having ordinary skill in the art; (4) at the time the invention was made." 2 A. Deller, Walker on Patents § 106 at 71.

In *Gass v. Montgomery Ward & Co.*, 387 F.2d 129 (7th Cir. 1967), the seventh circuit indicated that the district courts should consider all the elements of the *Graham* test when resolving the question of obviousness.

Therefore, in making its determination of obviousness, this Court must first consider the scope and content of the prior art, the difference between the prior art and Claim 3 of Andis '535, and the level of the ordinary skill in the art. *Graham, supra.* Against this backdrop, the Court shall then consider the obviousness of the claim.

1. *SCOPE AND CONTENT OF THE PRIOR ART AND THE DIFFERENCE BETWEEN THE PRIOR ART AND THE CLAIM*

In determining whether an invention is patentable as being nonobvious, the entire prior art must be taken into consideration. *New York Scaffolding Co. v. Liebel-Binney Construction Co.*, 254 U.S. 24, 41 S.Ct. 18, 65 L.Ed. 112 (1920). The prior art includes disclosures of anticipatory patents, publications and uses.

In the prosecution of its application before the patent office, plaintiff referenced the following patents: (PX 160)

| | | |
|---|---|---|
| Spencer | 1,491,320 | 4–22–24 |
| Need | 2,641,833 | 6–16–53 |
| Prueter | 2,860,413 | 11–18–58 |

During the trial of this matter, and in furtherance of its claim of obviousness, the defendant relied upon and noticed under 35 U.S.C. § 282 the following documentary prior art: (DX 87).

| | | |
|---|---|---|
| Harlow, et al. | 65,077 | 5–28–1867 |
| Noble | 299,839 | 6–3–1884 |
| Shannon | 532,188 | 1–8–1895 |
| Kuehne | 1,549,839 | 8–18–25 |
| Aaron | 1,970,518 | 8–14–34 |
| Andis | 2,037,957 | 4–21–36 |
| Rush | 2,074,239 | 3–16–37 |
| Hammerling | 2,094,651 | 10–5–37 |
| Boyd | 2,336,160 | 12–7–43 |
| Andis | 2,704,887 | 3–29–55 |
| Andis | 2,790,236 | 4–30–57 |
| Andis | 2,875,519 | 3–3–59 |
| Andis | 2,959,855 | 11–15–60 |

Having examined each of the patents referenced by the Patent Office and those noticed and relied upon by the defendant, the Court is driven to the conclusion that the Patent Office did indeed, as claimed by defendant, fail to reference the closest prior art in its examination of the application for the patent in suit.

Spencer (PX 160) teaches a hand-operated scissor-like device constituting a combined clipper, comb, and shears. It is not directed to a hair clipper blade set, and is not intended to be mounted transversely on the end of a motor housing. It does not show a "rectilinearly extending bearing surface disposed adjacent to a series of teeth along a rectilinear front edge." Nowhere does the Spencer patent describe the purpose of the reduced end portion of the blade. Its rendition presents relative dimensions and an aspect such that it appears unlikely to the Court that it would be used in the nostrils or the ears. Contrary to Claim 3, the Spencer device does not include narrow extension bars projecting laterally from each side of, and adjacent to, the forward edge of the body portion of a shear plate or movable plate.

Need and Prueter (DX 88) were apparently cited by the Patent Office to show that the general blade set described by the application was well known in the prior art except for the lateral extensions. Yet, the Court would agree with defendant that Andis Patent No. 2,790,236 (PX 69), while it also has what plaintiff describes as "square corners," discloses a blade set that, except for the two lateral extensions, is identical with that disclosed in the patent in suit. The teeth and bearing surface of the movable blade are complementary to the teeth and bearing surface of the shear plate. The shear plate and movable blade of the '236 patent and their complementary teeth and bearing surfaces perform exactly the same function in exactly the same way as the corresponding elements of the '535 patent in suit. Indeed, if the movable blade and shear plate of the '236 blade set were laterally extended on each side as taught by Claim 3, the resulting device would be identical to the blade set taught by Claim 3.

The '236 patent was embodied in plaintiff's Outliner that was sold beginning in 1955. PX 111 is an example of the second generation kind of outliner called "Outliner II." The Patent Office did not cite Andis '236 in its examination and it was not aware of the sales of the Outliner hair clipper.

Having considered the prior art cited by the Patent Office, the Court turns to that relied upon by defendant. Examination of the patents in DX 87 convinces the Court that many are not really relevant to the issues presented by Claim 3, except perhaps as they may disclose the general state of the art. Those the Court considers pertinent are, Harlow, Rush, Boyd, and possibly Kuehne.

Harlow Pat. No. 65,077 goes way back to 1867. It discloses a "machine or implement for cutting or shearing the hair or coats of animals, or grass or other fibrous substances." The plates A & B of the Harlow clipper and the cutting teeth, bearing surfaces, and extensions of said plates, perform substantially the same function in substantially the same way as the blade set of the patent in suit. As the Claim 3 of '535 is read on this device, however, one must note that the extensions of the shear plate and the movable plate, while they "project laterally from each side of the shear plate and movable plate adjacent to the forward edge thereof, they are not in rectilinear

alignment with the forward edge of the body portion of said plates. This fact destroys structural identity regarding the issue of anticipation, but Harlow remains as pertinent prior art.

Rush Pat. No. 2,074,239 is also relatively old. The specifications indicate a use in connection with pruning shears, but also allege adaptability to "scissors, tailor's shears, clippers, etc." Reading Claim 3 of '535 on the Rush structures, one is compelled to feel that there is great parallel at least as to the embodiment shown in Figure 3 and 4 thereof. The shear plate and the movable plate each has a body position with cutting teeth located adjacent the cutting teeth. To be sure, the tongue and groove bearing guide is not revealed in Claim 3. But as discovered with regard to anticipation, the Court feels that the greatest factor diminishing the impact of Rush as prior art is that the narrow extensions projecting laterally from the side of the body portion of the shear plate and the movable plate is not really adjacent the forward edge but is, in fact, co-terminous with the sides of the shear plate and the movable plate. Save for this caveat, the Rush device includes every element of Claim 3 of the '535 patent in suit, even though the device may not be specifically described as a clipper for hair.

The Rush patent was not cited by the Patent Office during its examination of the Andis '535 application.

The Boyd Pat. No. 2,336,160 (PX 62) is the prior art creating the greatest disagreement between the parties. Counsel for defendant stated that it was of primary importance to defendant's case. Mr. Fishleigh, one of defendant's experts, agreed with this assessment. Plaintiff contends: that Boyd is not directed to a *blade set* for a barber's hair clipper, but to an electric *shaver*; that it is no more pertinent than Spencer; that there is a presumption because of its classification (30/29.5) that it was considered by the Examiner and discarded for lack of pertinency; and that it does not render obvious the subject matter of Claim 3 of the patent in suit.

The Boyd patent (PX 62) discloses a hair cutting device "so constructed that, through the instrumentality of a lateral extension, a shaving operation may be carried out closely adjacent to or in the human nose, or in other similarly restricted places." The specifications also disclose that the "instrument is capable of carrying out the usual safety shaver operation, *at the same time*, that the cutting operation is going on in the restricted area. As plaintiff argues, nowhere in the Boyd patent is there any mention or suggestion for the use of the "lateral extension 12" thereof, or any modification thereof, in any other type of hair cutting device.

The Court's initial reactions during the trial was to regard Boyd as non-pertinent. The patent specifications talk in terms of a shaving head and not a blade set. Plaintiff defined a shaving head as constituting "an internal cutting mechanism including an outer guard having narrow slots or small openings which guard against injury to the person shaving and which materially inhibit passage there-through of all but relatively stiff stubble."

Because of the difficulty of feeding relatively limp, long hair through the relatively small perforations or slots in the outer guard, an electric shaver has little practical capability of cutting long, limp hair. It is important to note, however, that at this stage we are dealing not with the Boyd patent in terms of anticipation, but rather its relevancy as prior art dealing with the presence or lack of obviousness.

Notwithstanding the differences in function, when Claim 3 of '535 is compared with the Boyd device, it becomes apparent that the Boyd patent does disclose a blade set.

If the function description "safety shaver" is changed to "hair clipper" in Claim 3 of the Boyd patent, then this patent, as the defendant contends, accurately, although incompletely, describes the T-Edger which is covered by Andis '535. Claim 3 of the Boyd patent provides in part:

> A (safety shaver) comprising an elongated handle, a cutting device at one end of the handle, and means for actuating

the cutting device *extending far enough beyond one outer longitudinal edge of the handle to form a lateral portion of such dimensions as to be conveniently usable in the human nostril.* [emphasis added]

The device shown in the Boyd patent, except for the addition of the lateral extensions, is essentially the same as a commercial shaver or razor known as the Packard Lektro-Shaver which was sold in this country prior to 1960. It was manufactured under Aaron Pat. No. 1,970,518 (DX 98) which is prior art to the patent in suit.

In *Schick Dry Shaver, Inc. v. Dictograph Products Co.*, 89 F.2d 643 (2d Cir. 1937), the court had occasion to describe the Packard Shaver and referred to the tubular guard or stationary part of the cutter as a shear plate. This Court is likewise convinced, upon reflection, that the tubular guard 10 shown in the Boyd patent is a "shear plate"; that the movable tubular member 14 is a "movable blade"; and that members 10 and 14 interact to cut or clip hair just as the embodiment of Claim 3 of '535 does. Claim 3 of the '535 patent does not specify the shape of the movable blade and the language used does encompass a cylindrical or tubular movable blade as shown in the Boyd patent.

The cutting elements 15 of the Boyd patent perform essentially the same function in substantially the same way as the teeth of the '535 patent in that they cut or clip any strands of hair entering between the shear plate and the movable blade as the latter is reciprocated. The claims of the '535 patent, which recite a series of teeth extending along the forward edge of the body portion of the shear plate and the movable blade embrace the finely spaced cutting teeth of Boyd which also extend along the forward edge of the blade set.

The bearing surfaces between the shear plate and movable plate in the Boyd device extend rectilinearly along these members and perform the same function in the same way as the bearing surfaces between these same elements in the '535 patent.

That which makes the Boyd patent highly relevant as prior art on the issue of obviousness is the extension of the shear plate and movable blade laterally. In this, Boyd moves beyond both Aaron Patent No. 1,970,518 and the Packard Lektro-Shaver.

Mr. Bate testified that the subject matter of the Boyd patent was embodied in a Packard shaver having extensions protruding laterally about ¼ inch from each side of the head (Tr. 559), and that he had observed such a device sometime prior to 1936. (Tr. 560). The Court found no testimony as to when this embodiment was sold.

The Kuehne Pat. No. 1,549,839 is in the Court's opinion of marginal pertinence in considering obviousness. The claims:

> A hair clipper comprising a support, a fixed cutting blade with a series of teeth, a slidable toothed cutting blade in contact with the fixed blade. . . .

are not themselves pertinent. But Figure 3 does show lateral extensions of both the shear plate and the movable blade adjacent to the forward edge and with the forward edge in substantially rectilinear alignment with the forward edge of the body portion. That the rear edges of the lateral extensions taper in, does not, in the Court's opinion, totally destroy its pertinence although such lateral extensions are not part of the claims or specifications.

The Court finds the Harlow, Kuehne, Rush, and Boyd patents to be pertinent prior art, more pertinent than the Spencer, Need, and Prueter patents relied upon by the Patent Office.

2. *THE LEVEL OF ORDINARY SKILL IN THE ART AT THE TIME THE ALLEGED INVENTION WAS MADE*

Invention is seldom the work of a sole inventor, however, great a genius one may be. Since it is most often the product of the successive labors of innumerable men working at various times and often toward various objectives, the patent law lends protection to him who forges a link in the often complicated process that produces the finished invention if the link is devised by one who exercises a higher thought than the ordinary mechanic skilled in the art. *Electric Vacuum Cleaner Co., Inc. v. P. A.*

*Greier Co.*, 118 F.2d 221, 223 (6th Cir. 1941). 35 U.S.C. § 103 requires that the issue of non-obviousness must be decided from the viewpoint of a "person having ordinary skill in the art to which said subject matter pertains."

The Seventh Circuit in *Malsbary Manufacturing Co. v. Ald, Inc.*, 447 F.2d 809, 811 (7th Cir. 1971) said:

> Since the 'level of ordinary skill' in a particular art has not usually been defined in writing, the *usual way of determining such level is by referring to the subjective reaction of a person thoroughly familiar with the particular art and, if possible, one who practiced the art at the crucial time in question.* (emphasis added.)

Both parties produced witnesses who were skilled in the art involved; that is the design and development of hair cutting devices and shaving devices in the period 1962–63. The requisite level of ordinary skill is perforce a distillation of their level of skill, experience and training—and of the level of these factors in others who were in the field and about whom testimony was received.

Matthew L. Andis is the son of the inventor and owns about 50 percent of the stock of plaintiff corporation. He has been involved in the design, manufacture and sale of hair clippers by Andis Clipper Corporation since about 1954. From 1961 on, he was engaged full-time in all phases of the company, particularly with respect to sales and engineering. In 1971, he became general manager and president. He does not have any formal engineering training, but he has extensive practical experience in designing, manufacturing, and selling blade sets. He clearly knew the field very well and felt that in 1962 the prior art in general and the Boyd patent in particular did not render the '535 patent obvious. His opinion suffers somewhat, however, because its objectivity must be called into question because of his personal stake in the outcome of this case.

Henry R. Starke's testimony was offered by way of deposition. Mr. Starke was assistant vice president of sales, Professional Products Division of Oster at the time of trial. His experience was limited to sales, although the sales of all professional clippers, electric shavers, and etc. fell within his purview. In 1962, he was a divisional sales manager dealing with portable electric tools. The evidence offered by Starke was not particularly helpful in establishing the level of skill in the art, but did show clearly that the impetus to develop a new small finisher clipper originated with Starke who sent a memorandum to Mr. Orr, then president of Oster, requesting the development of such a new product (PX 6). The decision to move ahead on what ultimately became Oster Model 59 Finisher (PX 18) was consciously made, after obtaining a legal opinion from patent counsel. The direction the new product was to take seems to have been substantially a sales decision brought on by the changing styles of men's hair cutting and trimming.

Clarence T. Fishleigh is a consulting engineer and a registered professional engineer with a bachelor of science degree in electrical engineering and a juris doctor in Law. He has an extensive background in testing, consultation, and testifying regarding mechanical and patent problems. Furthermore, he has extensive automotive engineering experience. He indicated he had testified in over 100 patent cases. He was familiar with the pertinent prior art, the concept of obviousness, and had, in fact, testified in the *John Deere* case. Defense took Mr. Fishleigh very thoroughly through the Harlow, Rush, Aaron, and Boyd patents relating their component members to the claims of Andis '535. The witness opined that given the state of skill of the art in 1962 and 1963, the lateral extension of a blade set was an obvious development.

Mr. Alan Bate's testimony was presented by deposition. Mr. Bate has a degree in electrical engineering, has taught at the California Institute of Technology, and has some graduate credits in engineering. In addition, he is a registered professional engineer in the State of Wisconsin. In May, 1953, he joined Oster as chief engineer and

at the time of trial he was vice president of engineering for Oster Corporation. When a new project was under contemplation and development, he spent a substantial portion of his time on that project. Bates was thoroughly familiar with the art and with barbering needs and practices as applied to the art of developing hair cutting and shaving devices. His opinion, which must also be viewed with caution because of obvious interest, was that the teachings of Claim 3 of Andis '535 were clearly obvious.

Testimony was received regarding a number of individuals who did not themselves testify at the trial. John Oster, Sr., defendant's founder and chairman of the board in the early 1960's, was an inventor of a number of patents in the hair cutting field and has over 30 years of experience in designing and manufacturing within the art. Oscar E. Lackner, an employee of defendant, was the inventor of at least one patent in the field and at the time Patent '535 was applied for had over 30 years of experience in the field of hair clippers and blade sets. Stephen Sadlow was also an employee of Oster Corporation, having worked from 1951 to 1963 in the hair clipper field. For a considerable period he was in charge of hair clipper design and development. Sadlow designed PX 81, the blade set utilized on the Oster "Finisher." Gregor Lonne was one plaintiff's employee working in the field. He possessed a European engineering degree and was alleged to have designed hair clippers for 47 years, although he personally did not own any patents. Z. Burreson, who had mechanical engineering training and extensive small appliance design and manufacturing experience, joined Andis Clipper Company in September, 1966, and spent six years there as a chief engineer.

Having reviewed the level of skill of some of the "dramata personae," the Court is of the conclusion that the level of ordinary skill of those engaged in the design and fabrication of hair cutting devices and hair shaving equipment in 1962–63 was quite high. Those skilled in the trade are not the barbers and technicians who used the equipment, but the engineers, designers, and craftsmen who invented, designed, and constructed the devices themselves. Those of ordinary skill in the art would in the Court's opinion, ordinarily be graduate mechanical or electrical engineers with a number of years of experience in working with others in conceptualizing, engineering, testing, and tooling up for the production of new and modified hair cutting devices.

### 3. *THE QUESTION OF OBVIOUSNESS UNDER 35 U.S.C. § 103*

Having concluded that the ordinary skill of the art in 1962–63 was high; that it was represented by an individual with university engineering training, and with substantial experience in the design of new hair cutting devices; that such an individual was customarily a part of a "unit" or "team" dealing with new concepts and new projects on a continuous basis; that the professional engineer usually had available the services of a number of non-professional but highly trained craftsmen, it becomes the Court's obligation to project itself backward in time and come to some conclusion as to whether or not the essence of the patent in suit, *lateral extensions of the blade set*, would have been obvious to a person skilled in the art in 1962–63.

Having determined that Harlow, Rush, Boyd and possibly Kuehne are more relevant to the issue than that cited to the Patent Office, the Court must make its decision in the light of that *pertinent prior art.* As indicated above, it is not felt that Harlow or Rush anticipate Andis '535 because there is a lack of identity of structure; Harlow's lateral extensions are not in rectilinear alignment; Rush's extensions are not really extensions; Kuehne is of dubious value on this issue because the lateral extensions are not really the essence of the patent claim and, in fact, they seem to exist almost by accident. Nonetheless, despite a belief that they do not anticipate, the Court does find that they are pertinent prior art on non-obviousness. All three teach lateral extensions of the blade sets and shed light on what would have been obvious to the practitioner in the art in 1962–63.

The Andis '236 patent which the Court also found to be pertinent prior art, teaches a blade set identical with that taught by the patent in suit except for the lateral extensions.

It is Boyd upon which the issue must be resolved. The Boyd patent was issued December 7, 1943, so it clearly antedates Andis '535 by nearly twenty years. The person of ordinary skill in the art is assumed to have knowledge of the prior art in his field. *Esso Research & Engineering Co. v. Kahn & Co.*, 379 F.Supp. 205, 213–214 (D.Conn.1974). Mr. Matthew G. Andis, the inventor of Andis '535 did not testify and consequently the Court does not know, in fact, the state of his knowledge of the Boyd patent. It is evident that prior to filing the application which became Andis '535, plaintiff caused a search of the prior art to be made and the Boyd patent was revealed at that time. Those practitioners of the art who testified were conversant with Boyd. Mr. Bate certainly had prior contact with a double-ended Boyd device (Tr. 559). Plaintiff argues that Bate's failure to invent the T-blade set after he had previously seen and was familiar with a Boyd device that had extensions on both ends is evidence of non-obviousness but that, nonetheless, the device was not prior art. The Court does not understand nor accept this. Boyd must be treated as prior art and the Court must take into account the double-ended Packard shaver with which Bate was familiar.

Boyd discloses an electrically powered hair cutting device useful for shaving hair on the human body and includes a lateral extension of the blade set adapted to cutting hair in the nostrils and other restricted areas to remove superfluous hair. The Boyd patent relates to a blade set for attachment to such a powered hair cutting device. Although Boyd does *not anticipate* Andis '535, it is pertinent prior art on the present question of non-obviousness. Both Boyd and Andis '535 recite in their specifications that the purpose of the device is related to penetrating into the nostrils. Both teach the lateral extension of the blade set to provide such penetration. That the Andis '535 subsequently found its greatest utility in trimming on the neck or behind the ears would not, in the Court's opinion, obliterate Boyd's teachings as pertinent prior art.

Both Claims 2 and 3 of the patent in suit are considered on the question of obviousness. Claim 2 is broad enough to cover a blade set with one lateral extension and there is really no difference between the teachings of Claim 2 of the Andis '535 patent and the Boyd patent.

Claim 3 of the Andis '535 patent differs from the Boyd patent only by reciting lateral extensions on each side of the blade set whereas the Boyd patent discloses extensions on only one side of the shear plate 10 and the movable blade 14. Mr. Fishleigh testified that:

> [I]t would have been an obvious mechanical expedient if one had an extension on one side to put one on the opposite side. That is my view. One of the simplest things that a model maker or machinist mechanic would know how to do. (Tr. p. 1058)

The Court agrees and finds that the disclosures of Claim 2 and of Claim 3 of the patent in suit would have been obvious to one of ordinary skill in the art. The difference between a blade set with one lateral extension and a blade set with two lateral extensions is in truth a minor accommodation that would readily suggest itself as obvious to one of ordinary skill in the art.

It became apparent during the trial that the specifications and claims of the patent in suit read directly on the prior art. Plaintiff sought to, in effect, modify the claims by proving up limitations or differences between the claims and the prior art that might exist in practice but do not exist as one reads the language of the claims. Examples of this were the effort to show; (1) that Andis '535 taught "a hair clipper for clipping long limp hair and not stubble and not for shaving," (2) "a shear plate which is flat and not of any other shape," (3) "teeth which are converging with diverging spaces and with no parallel sides."

Under 35 U.S.C. § 112, it is impermissible in defense of a patent to read into the specifications or claims of the patent structures or uses that may inhere in the embodiment of the patent or the uses of that embodiment but which are not in fact in the language of the claim or claims in issue. *McCarty v. Lehigh Valley R. R.*, 160 U.S. 110, 16 S.Ct. 240, 40 L.Ed. 358 (1895); *Fredman v. Harris-Hub Co.*, 442 F.2d 210, 214 (7th Cir. 1971). The applicant must define precisely what his invention is. Mr. Andis said his invention was a "Blade Assembly with Lateral Extensions" which "can be introduced into the nostrils or ears to remove superfluous hair." Claim 3 teaches the blade assembly with lateral extensions.

This same issue is present with respect to what plaintiff calls "initially unrecognized advantages" and defendant calls "afterthought advantages." Use in trimming and outlining, improved visibility, free fall of hair, the use of a small compact motor housing, and selectivity between the two lateral extensions all fall into these categories. 35 U.S.C. § 112 would seem to be particularly applicable where the existence of a crowded art requires strict and narrow reading of claims and specifications. Plaintiff here contends, however, that in both *Lincoln Engineering Co. v. Stewart-Warner Corp.*, 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008 (1938) and *Graham v. John Deere Co., supra,* the Court considered "afterthought" advantages despite the fact that in each case there was nothing said in the specifications regarding such advantages.

Here, the Court need not decide between the contending versions of the law because, in its opinion, none of these claims if read into the patent would alter the obviousness of the lateral extensions of the blade set to one of ordinary skill in the art at the time.

The alleged invention defined by Claims 2 and 3 of the Andis '535 patent actually comprises a combination of individually old elements. The elements of the blade set exclusive of the lateral extensions are all present in the Andis '236 patent (DX 87) and a lateral extension on one side of the blade set is shown in Boyd. Such a combination of old elements which produces no new, unusual, surprising, or synergistic results is not patentable. The lateral extension to both sides was a simple mechanical expedient and thus obvious.

4. *SECONDARY CONSIDERATIONS*

In the same case which established the non-obviousness test, the United States Supreme Court also listed several so-called "secondary considerations" which may illuminate the issue of obviousness. *Graham v. John Deere Co., supra.* Case law handed down in this circuit and elsewhere, however, has generally held that, while such considerations may tip the scales in close cases, they do not displace the prime consideration of non-obviousness and may not be used to create a doubt where none would otherwise exist. *See, e. g., H. W. Gossard Co. v. J. C. Penney Co.*, 304 F.2d 515 (7th Cir. 1962).

Plaintiff argues that non-obviousness is demonstrated here by the solution to a long-felt need; that defendant's copying of plaintiff's T-blades indicates a failure or absence of invention by others; and, that plaintiff's commercial success evinces non-obviousness. The Court does not believe such subordinate indicia should be considered in the absence of any doubt in its mind as to obviousness. It would, however, note the following:

(A) *Long Felt Need*

Plaintiff argues that the Boyd patent is an early recognition of the need for an effective device for cutting hair in restricted places. As defendant points out, this seems to be inconsistent with plaintiff's vigorous denial of Boyd as pertinent prior art. Of even greater force, however, is the fact that the "problem area" or "need" disclosed by Boyd; *i. e.*, cutting hairs in the nose or other similarly restricted places, is exactly the "need" to which the specifications of Andis '535 are addressed. Neither application claims to solve any problem of "trimming" or "outlining." There is no limitation in the claims of Andis '535 which would indicate such a "problem." Under 35 U.S.C. § 112, if a patentee claims to solve a

longstanding problem, the problem, along with the best method of solving it then known to the patentee, must be disclosed. *Shelco, Inc. v. Dow Chemical Co.*, 322 F.Supp. 485, 499 (N.D.Ill.1970), *aff'd*, 466 F.2d 613 (7th Cir.), cert. denied, 409 U.S. 876, 93 S.Ct. 125, 34 L.Ed.2d 129 (1972).

The five-year period (1963–68) during which the Andis '535 patent lay dormant, a so-called "paper patent," does not enhance plaintiff's contentions of long-felt need. The Court found no such need.

(B) *Defendant's Alleged Copying*

The argument is made that defendant's engineering and design personnel, who were skilled in the art and working in it, reacted to a long-felt unresolved need by copying plaintiff's blade set and that it thereafter enjoyed good commercial success. It is contended that the fact that Oster employees did not develop a T-blade set means that it was not obvious in the light of Boyd.

Considerable trial time was spent on the question of whether the Andis '535 was a response to a long-felt need or just happened to come along when there was desire on the part of barbers for lighter, smaller trimmers with as great a cutting blade edge as possible. On the testimony adduced, particularly that of Gus Manous of the Twin City Barber College, as well as others, the Court finds that there was a distinct change in men's haircut styles in the period 1966–68 and that the development of both the T-devices and the accused devices (PX 18 and PX 106) was a response, not to a need for cutting hair in the nostrils or other restricted places, but rather to a demand for lighter, smaller, faster trimmers. Long, styled hair and beards became a part of the American scene along with the Beatles and Vietnam veterans. Apparently this type of hair cutting required different tools, *i. e.*, blow dryers, hot combs, curling irons, and a whole new generation of small light clippers (Tr. 665). Mr. Bate testified that the traditional clippers like Oster Model 76 and Oster Model 10 were roughly four times as heavy as the Model 59 (PX 18), one of the two accused devices. The need was for a light, small clipper that could be used more rapidly, with greater precision, and with greater ease in "outlining," "arching," or making a square cut on the sideburn. There was also a desire on the part of Oster to participate in the acceptance of a dry neck shave (Tr. 787). Oster, like plaintiff, encountered no particular need for a lighter, slimmer device with the blade projecting beyond the housing until the latter part of the decade of the 1960's. When the demand came, it was for a clipper that was as light as possible, with a blade as wide as possible, which the barber can use in working up to a line (Tr. 789). The lateral extensions to the blade set, as taught by Boyd, was an obvious mechanical design that met such criteria.

There was no evidence that anyone else in the art was working on any problems alleged to have been solved by the Andis '535 claims or specifications.

(C) *Commercial Success*

In addition to requiring that commercial success be viewed as a secondary consideration only if the obvious or non-obvious issue is close, the law further requires that any commercial success to be relevant must be attributable to the features of the claims in the patent and not to other market factors, *Shelco, Inc. v. Dow Chemical Co.*, 322 F.Supp. at 518. DX 108 and DX 109 are relevant in this regard. Plaintiff sold 167,095 light clippers with standard blade sets from 1968 through 1971 (years when sales/advertising expenses comparisons were possible) at an advertising cost of $26,191.00 (15½¢ per unit). During the same period, plaintiff sold 94,470 light clippers with T-blades at an advertising cost of $35,025.00 (37¢ per unit). With due recognition to the fact that the T-devices were a new product being introduced, it nevertheless appears that plaintiff spent more than twice as much per unit in advertising its

T-devices and, yet, the T-blades did not supplant the regular blades in the market.

It would appear that the standard blade set continues in popularity with the market. The evidence of great commercial success is simply not sufficiently persuasive to overcome this Court's doubts on the issue of obviousness.

Having reviewed those secondary considerations which the parties debated during the trial, the Court finds nothing to lead it to alter its conclusion that the lateral extensions to both sides of a blade set as set forth in Andis '535 fail to meet the requirements of 35 U.S.C. § 103.

 Hence, having reviewed the prior art and compared it with the claims in issue, the Court finds that the differences between the prior art and the claims of the patent in issue are nonexistent or insignificant. The Court finds that the subject matter would have been obvious to a person having ordinary skill in the art at the time in question.

## IV. PLAINTIFF'S CONDUCT IN PROSECUTING THE PATENT IN SUIT

 Defendant alleges that plaintiff intentionally withheld from the Examiner of the Patent Office knowledge of highly pertinent prior art, namely, Boyd Pat. No. 2,336,160 (DX 87) and Andis Pat. No. 2,790,-236 (DX 87); that this prior art was much more pertinent than that cited by the Patent Office; that if the Boyd prior art had been known to the Examiner the patent would never have issued; and that such "unclean hands" on the part of the plaintiff itself renders the patent invalid, thus warranting an award of attorney's fees under 35 U.S.C. § 285. Although the patent is invalid on obviousness grounds, the fraud element must be present to entitle defendant to attorney's fees.

Plaintiff contends it did not breach any duty to disclose because there is no anticipation of Claim 2 or Claim 3 by the Boyd Patent '160 (PX 87) and because the Spencer Patent '320 is at least as pertinent as Boyd.

 Attorneys, agents, and applicants "who have applications pending with the Patent Office or who are parties to Patent Office proceedings have an uncompromising duty to report to it all facts concerning possible fraud or inequitableness underlying the applications in issue." *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945). Thus, if an applicant knows of prior art which plainly describes his claimed invention or comes so close that a reasonable man would say that the invention was not original and had been anticipated, he will not be excused for failure to disclose his knowledge. 5 A. Deller, Walker on Patents § 441. But an applicant is under no obligation or moral duty to call to the attention of the Patent Office a significantly different prior patent which he in good faith believes not to disclose his improvements. *United States v. Standard Electric Time Co.*, 155 F.Supp. 949 (D.Mass.1957). Where prior art does not anticipate, there is no obligation to call this prior art to the attention of the Patent Office. *Allied Research Products, Inc. v. Heatbath Corp.*, 300 F.Supp. 656 (N.D.Ill.1969).

It has been held that failure to call to the Examiner's attention prior art that is no more pertinent than that already cited to the Patent Office does not constitute a fraudulent representation before the Patent Office. *Oglebay Norton Co. v. Universal Refractories Corp.*, 300 F.Supp. 1106 (E.D. Wis.1969). Of course, it has also been held that to render the patent unenforceable, or to make the case exceptional, it is not necessary that plaintiff's conduct be shown to be fraudulent; all that is required is a showing that plaintiff failed to meet its "uncompromising duty" of candor and good faith. *L. F. Strassheim Co. v. Gold Medal Folding Furniture Co.*, 477 F.2d 818, 824 (7th Cir. 1973).

Here, plaintiff's patent counsel caused a search of prior art in preparation for applying for Andis '535. The search revealed Boyd and Andis '236 as prior art. It should be noted that plaintiff's answer to defendant's interrogatory 27 indicated that plaintiff became aware of the Boyd patent in February, 1962. There is no question that plaintiff did not reveal Boyd to the Patent Office. The Court has previously found that Andis '535 was not anticipated by Boyd '160 because of lack of functional identity. But it has also found Boyd to be more pertinent on the issue of obviousness than the prior art cited.

The cases which distinguish between "fraud" and "inequitable conduct" center on the "but for" requirement discussed in *SCM Corp. v. Radio Corporation of America,* 318 F.Supp. 433, 449–450 (S.D.N.Y.1970). Even if misrepresentation is shown, some courts have opined that a sufficient proof of fraud to warrant invalidity must include a showing that the patent would not have issued "but for" the patentee's concealment of prior art. Other courts, however, have held that proof of mere misrepresentation is enough to establish fraud on the Patent Office. *See, e. g., Corning Glass Works v. Anchor Hocking Glass Corp.,* 253 F.Supp. 461 (D.Del.1966).

The Court is convinced from the record that the patent in suit would not have issued "but for" the failure to cite Boyd '60 and Andis '236 to the Patent Office. But the Court is unwilling to find that, ergo, the conduct of plaintiff was of such bad faith, *i. e.,* fraudulent as to render the patent unenforceable on this ground. Furthermore, this case is not "exceptional" under the alternative ground for the recovery of attorney's fees permitted by courts under 35 U.S.C. § 285. *See, e. g., L. F. Strassheim, supra.*

It is the opinion of this Court that a good faith belief was held by plaintiff that Boyd and Andis '236 were not pertinent and should not be cited. The issue as to *internal* and *external* cutters; the very strong contentions of plaintiff that Claim 3 of the patent in suit called for a shear *plate* and that this inferred flatness and precluded the tubular guard 10 of the Boyd Pat. '160 (PX 62) and the similar guard of the Packard shaver manufactured under the Aaron patent, U.S. Pat. No. 1,970,518 (DX 87, Tab 16 and DX 97); the dispute between the parties as to whether the power source, hand or electric motors, was a distinction affecting pertinency; and, plaintiff's argument that both Boyd and Spencer illustrate an extension in the direction of reciprocation of the teeth, all are indicative of reasonable contentions on the part of the plaintiff for its position that Boyd is non-pertinent prior art.

The Andis '236 is considered pertinent prior art by the Court because it discloses a blade set that is identical to that of the patent in suit except for the lateral extensions. Andis '236 does disclose all of the relationships between the shear plate and the movable plate; the position of the blade set with reference to the bearing surfaces and the body portions thereof. But it does not disclose the essential feature of lateral extension of the blade set which Boyd reveals. Hence, although deemed prior art, Andis '236 is, in the Court's opinion, not so definitive of the essence of the patent that "but for" the failure of plaintiff to reveal it to the Patent Office the application would not have been granted. *SCM Corporation, supra.* As mentioned earlier, however, the Boyd patent was pertinent prior art albeit that plaintiff had a good faith mistaken opinion that it was not.

Because it is persuaded that plaintiff's positions as to the pertinence of Spencer and non-pertinence of Boyd and Andis '236 are good faith contentions and were, in fact, the belief of plaintiff at the time of application, the Court does not find fraud or bad faith.

Title 35 U.S.C. § 285 authorizing attorney's fees to a prevailing party should

not be allowed to a prevailing party in an ordinary patent suit free from bad faith or fraud, as such allowance is in the nature of a penalty or fine imposed on the losing party because of his conduct in instituting and maintaining the action without justification or in bad faith. *Vischer Products Co. v. National Pressure Cooler Co.,* 92 F.Supp. 138 (E.D.Wis.1950). Such bad faith the Court does not find. Nor does it find the patent unenforceable because of "unclean hands" on the part of plaintiff.

## V. INFRINGEMENT

At the outset of the trial, to simplify the issues, the parties stipulated that plaintiff limited its claim of fringement to Claim 3 of the patent in suit and agreed that, if the patent were to be found invalid, it would disclaim Claims 1 and 2. It was also agreed that, if the patent was found to be valid, but not infringed, plaintiff would never claim infringement as to Claim 1 or 2.

The accused infringing devices are the Oster Model 59 Finisher Hair Clipper (PX 18) and the Oster Model 160 Trimmer (PX 106). The patent in suit was granted August 23, 1963. Beginning in November, 1967, the plaintiff commenced selling hair cutting devices known as T-Edgers incorporating the application of Claim 3. Similar devices, known as the "T-Liner," "Style-Liner," and "T-Outliner" were introduced in 1970, 1971–72, and 1971 respectively.

The Court has previously set forth findings regarding the events preceding defendant's entry into the market and the parties' stipulation that defendant began selling its Oster Finisher Hair Clipper, Model 59 (PX 18) subsequent to the time the original complaint was filed, but prior to the filing of the supplemental complaint.

Although not actually stipulating infringement, defendants did not offer any substantial testimony in this regard.

Having set forth these matters as they relate to the question of infringement, the Court takes note of the general law that infringement is in the nature of a trespass on the property right of a patent owner; that for infringement to occur, there must, in fact, be a property right secured by the claims of the patent; and that if a party does not possess any valid patent property rights, there can be no trespass and no infringement. 7 A. Deller, Walker on Patents, Chapter XVIII.

In the case at bar, the Court has determined Andis '535 to be invalid for failure to meet the standards of the non-obviousness test prescribed by § 103 of the Patent Act. It is the general rule that an invalid patent cannot be infringed. *Ever-Wear, Inc. v. Wieboldt Stores, Inc.,* 427 F.2d 373 (7th Cir. 1970).

When the claim of the patent in suit is invalid, the question of infringement is moot. *Flakice Corp. v. Liquid Freeze,* 130 F.Supp. 471 (N.D.Cal.1955). An increasing number of courts do not inquire further into alleged infringement once the patent is determined to be invalid, *Ever-Wear, Inc. v. Wieboldt Stores, Inc., supra;* 7 A. Deller, Walker on Patents § 558, and this Court thus will consider the issue no further.

## VI. SUMMARY

The parties having acknowledged the Court's jurisdiction of the parties and venue, and the Court having set forth its findings and conclusions herein, it is to be noted:

(1) that the patent in suit is new and useful under 35 U.S.C. § 101; not anticipated under § 102, but invalid as obvious under § 103;

(2) since an invalid patent cannot be infringed, there is no infringement;

(3) the doctrine that a patent procured by fraud is unenforceable is non-applicable since the Court does not find such fraud;

(4) the case is not an extraordinary case under 35 U.S.C. § 285;

"APPENDIX"

Aug. 27, 1963 M. G. ANDIS 3,101,535

BLADE ASSEMBLY WITH LATERAL EXTENSIONS

Filed March 14, 1962

Fig. 1.
Fig. 2.
Fig. 3.

INVENTOR
MATTHEW G. ANDIS
BY
Wheeler, Wheeler & Wheeler
ATTORNEYS.

United States Patent Office

3,101,535
Patented Aug. 27, 1963

3,101,535

# BLADE ASSEMBLY WITH LATERAL EXTENSIONS

Matthew G. Andis, Racine, Wis., assignor to Andis Clipper Co., Racine, Wis., a corporation of Wisconsin Filed Mar. 14, 1962, Ser. No. 179,627 3 Claims. (Cl. 30—29.5)

This invention relates to a set of hair clipper blades with laterally extending tooth bars.

Vibratory electric hair clippers commonly have blade sets which are generally rectangular with widely separated bearing surfaces which support and guide the movable blade for lateral reciprocation on the fixed blade or shear plate. Without changing the general character of the blade in so far as its bearing surfaces are concerned, the present invention contemplates the provision of laterally extending tooth-carrying bars which comprise narrow lateral tongues projecting from both of the relatively movable blades and upon which the series of teeth of the respective blades are continued clear to the ends of the respective tongues. This results in greatly increasing the length of the series of teeth, and the teeth at both sides of the blade are on very narrow bars which can be introduced into the nostrils or ears to remove superfluous hair. To provide such extensions on an otherwise standard blade set, thereby making the conventional broad or widely spaced bearing surfaces effective to control the movement of the extensions of the respective blades is an objective of the present invention.

In the drawings:

FIG. 1 is a fragmentary view in section taken on the longitudinal center line of a vibratory hair clipper, the casing and the vibratory armature being fragmentarily illustrated to show how the movable blade is actuated and guided.

FIG. 2 is a view taken in section on the line 2—2 of FIG. 1.

FIG. 3 is a view showing in perspective the relatively separated component parts of the blade set.

The clipper is of the general type shown in Patent 2,959,855, issued November 15, 1960. The armature bar 4 is caused to vibrate within casing 6 in any manner, as by a conventional A.C. magnet (not shown). The spring 8 transmits both pressure and motion to the movable blade 10, maintaining the blades in bearing contact and causing blade 10 to reciprocate upon the stationary blade or shear plate 12, with the teeth in shearing contact.

The shear plate has a body portion with a bearing surface at 14 which is usually continuous for the width of the plate and extends onto the teeth 60. It is likewise provided with a bearing surface at 16. The movable blade 10 has a body portion with a bearing surface 18 complementary to the bearing surface 14 and it has laterally spaced thickened bearing pads 20 which bear on the surface 16 of the fixed blade or shear plate 12.

For guiding the movable blade 10 in the course of its reciprocation, I preferably employ a guide insert 22 which has margins 24 engaged with the shoulders 26 of blocks 20. The insert has a rearwardly projecting arm 28 anchored by screws 30 which are threaded into tapped holes 32 of the shear plate, preferably passing through a gasket 34 which is separately illustrated in FIG. 3.

The pressure and motion of the spring 8 connected with armature 4 is transmitted to the movable blade 10 through a bushing 36 connected to the end of the spring by screw 38. This bushing may be of nylon or similar synthetic resin. In preferred practice its cylindrical portion is engaged in the slot 40 of the movable blade 10 and its flange 42 engages the blade adjacent the margins of the blade securely to the shear plate.

The present invention contemplates the provision of integral lateral extension bars 50 and 52 on the movable blade 10 and like extension bars 54 and 56 on the fixed blade or shear plate 12. It will be observed that the teeth 58 of the movable blade and the complementary teeth 60 of the shear plate are continuous not only in the usual range across the ends of the respective blades, but for the full length of the extension bars 50, 52, 54, and 56. However, the front to rear dimensions of the respective extensions are narrow as compared with the relatively great dimensions of the blades proper in front to rear directions. The extension bars are narrow enough to be used within the nostrils or ears and yet the respective teeth on the extensions operate with the same accuracy and lack of cramping or undue friction as do the teeth within the normal range of reciprocation of the respective blades, guidance of the relatively reciprocable bars being derived from the bearing surfaces of the blades proper.

I claim:

1. A hair clipper blade set comprising a shear plate, a movable blade, means guiding the movable blade for reciprocation transversely of the shear plate, mutually aligned bars projecting laterally from opposite sides of the shear plate immediately adjacent its forward end, said bars being of limited narrow extent in a direction forwardly and rearwardly of the shear plate, bars projecting oppositely from the forward end of the movable blade and overlying the bars of the shear plate and of correspondingly limited extent in a direction forwardly and rearwardly of the movable blade, said shear plate and movable blade having at their respective forward edges complementary teeth substantially uniformly spaced across the respective forward margins of the shear plate and movable blade and the respective bar extensions thereof, the shear plate and movable blade having complementary bearing surfaces along the bases of said teeth extending rectilinearly from the end of one bar to the end of the other bar, said plate and blade also having complementary bear-surfaces first mentioned.
ing surfaces spaced rearwardly from the

2. A hair clipper blade set comprising a shear plate having a body portion with a transversely extending forward edge, a narrow extension bar projecting laterally from the side of said body portion adjacent said forward edge with its forward edge in substantially rectilinear alignment with said forward edge of said body portion, a series of teeth extending along said forward edges of said body portion and of said extension bar, and a rectilinearly extending bearing surface disposed adjacent to said teeth along said body portion and said extension bar, and a movable blade mounted for transverse reciprocation on said shear plate, said movable blade having a body portion, an extension bar, a series of teeth, and a bearing surface, said extension bar, teeth, and bearing surface of said movable blade being complementary to said extension bar, teeth, and bearing surface of said shear plate.

3. A hair clipper blade set comprising a shear plate having a body portion with a transversely extending forward edge, a narrow extension bar projecting laterally from each side of said body portion adjacent said forward edge, each extension bar having its forward edge in substantially rectilinear alignment with said forward edge of said body portion, a series of teeth extending along said forward edges of said body portion and of said extension bars, and a rectilinearly extending bearing surface disposed adjacent to said teeth along said body portion and said extension bars, and a movable blade mounted for transverse reciprocation on said shear plate, said movable blade having a body portion, a pair of oppositely projecting extension bars, a series of teeth, and a bearing surface, said extension bars, teeth, and bearing surface of said movable blade being complementary to said extension bars, teeth, and bearing surface of said shear plate.

References Cited in the file of this patent

UNITED STATES PATENTS

| | | |
|---|---|---|
| 1,491,320 | Spencer | Apr. 22, 1924 |
| 2,641,833 | Need | June 16, 1953 |
| 2,860,413 | Prueter | Nov. 18, 1958 |